Yosef Peretz (SBN 209288)
yperetz@peretzlaw.com
David Garibaldi (SBN 313641)
dgaribaldi@peretzlaw.com
PERETZ & ASSOCIATES
22 Battery Street, Suite 200
San Francisco, CA 94111
Tel: 415.732.3777
Fax: 415.732.3791

Attorneys for Defendant KARL-HEINZ PIEPER

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| 640 OCTAVIA, LLC<br><br>              Plaintiff,<br><br>v.<br><br>KARL-HEINZ PIEPER and DOES 1-45, inclusive,<br><br>              Defendants. | Case No.  3:18-cv-01047-WHA<br><br>**DECLARATION OF YOSEF PERETZ IN SUPPORT OF DEFENDANT'S  MOTION TO PRECLUDE THE EXPERT WITNESS TESTIMONY OF AND EVIDENCE OFFERED BY PLAINTIFF'S EXPERT, RON MARTINELLI** |

I, Yosef Peretz, declare as follows:

1.      I am the principal of Peretz & Associates, counsel of record for the Defendant in this matter, KARL-HEINZ PIEPER ("Defendant" or "Pieper").  I make this declaration in support of Defendant's Motion to Preclude the Expert Witness Testimony and Evidence Offered by Plaintiff's Expert, Ron Martinelli. If called as witness in this matter I would and could competently testify to the following.

2.      From the beginning, Plaintiff's litigation tactics have been aggressive, and Plaintiff's counsel has refused to meet and confer with Defendant's counsel on various issues.  For example, through an accidental omission, Plaintiff thought the Answer was supposed to be filed on September 7, 2018 under FRCP 12(a)(1)(A)(i), and did not timely file an Answer by the actual deadline of August 31, 2018.

3.      Though Plaintiff's counsel had already appeared in this case by that time, Plaintiff made no attempt to meet and confer over this issue, but instead rushed to file a Motion for Entry of Default.  When Defendant sought to meet and confer with Plaintiff's counsel on September 7, 2018, Plaintiff ignored two emails that included a draft Answer, and instead required Defendant to go through a fully-briefed motion as well as requiring Defendant to file his own Motion for Leave to File a Later Answer, which *Plaintiff did not even bother to oppose*.  The Court granted Plaintiff's motion in this instance. True and correct copies of the email correspondence that Plaintiff ignored are attached hereto as Exhibit ("Exh.") 1.

4.      In another egregious failure to meet and confer, Plaintiff served Defendant's roommate, who is a third party to this action. A copy of the Subpoena is attached hereto as Exh. 2.

5.      In violation of FRCP 45 Plaintiff did not provide Defendant with any notice that it issued the Subpoena at that time.

6.      When the production deadline passed without the roommate providing any objection or response, Plaintiff did not alert either Defendant or is roommate, but rather was quick to file a Motion to Enforce the Subpoena, seeking sanctions against the unrepresented third-party roommate.

7.      This motion was the first notice that Defendant had of the existence of the Subpoena, and Defendant promptly sought to meet and confer in good faith to resolve this issue.  A true and correct copy of this email correspondence is attached hereto as Exh. 3.

8.      Though Defendant offered to assist in the response to the Subpoena, and though his roommate in fact produced no fewer than 1,328 responsive documents to the Subpoena, Plaintiff refused to engage in this meet and confer effort until the *date that Defendant's opposition was due*.

9.      This stonewalling conduct has continued.  After agreeing at the beginning of December to accept service of a subpoena on behalf of one Randi Hite ("Hite"), Plaintiff agreed to produce Hite for a deposition, but Plaintiff's counsel cited a scheduling conflicted for the noticed date of Hite's deposition as a basis for rescheduling.  A true and correct copy of the relevant email chain is attached hereto as Exh. 4.  Defendant agreed in good faith and asked that Plaintiff waive any objection to Hite's deposition taking place after the discovery cutoff, and Plaintiff agreed.

10.     On December 19, 2018, after not having received any proposed dates from Plaintiff, Defendant emailed to ask for dates, but got no response.  A true and correct copy of the December 19, 2018 correspondence is attached hereto as Exh. 5.

11.     On December 21, 2018, Defendant reminded Plaintiff again about this matter, but received no response.  A true and correct copy of the December 21, 2018 correspondence is attached hereto as Exh. 6.

12.     On January 4, 2019, Plaintiff and Defendant engaged in a telephonic meet and confer over other matters, and Defendant verbally asked Plaintiff to provide dates, but to date has gotten no response.

13.     Plaintiff's counsel has not provided a date for Hite's deposition to date.

14.     Plaintiff did not provide a list of topics about which it intended to have an expert offer testimony in advance of an expert disclosure, not on November 23, 2018 as ordered by the CMO and not on a later date.

15.     Furthermore, Plaintiff *did not provide* any expert disclosure or opening report on December 21, 2018, the due date for opening disclosures and reports.

16.     In the meantime, Defendant provided both documents timely by mailing a list of topics upon which he would have an expert opine on November 21, 2018, and by providing an expert disclosure and report on December 21, 2018.  True and correct copies of these documents are attached hereto as Exhs. 7 and 8, respectively.

17.     It was not until January 4, 2019, the due date for rebuttal reports, that Plaintiff offered an expert report of one Ron Martinelli ("Martinelli"), and prior to submitting its expert report, counsel for Plaintiff offered no explanation or mitigating reason for the lateness of this disclosure, nor did it ask the court in advance for any extension of the expert discovery deadlines.  A true and correct copy of Martinelli's report is attached hereto as Exh. 9.  Further, Plaintiff did not make any offer about how the prejudice caused by its failures should be ameliorated.

18.     True and correct excerpts from the transcript of the testimony offered at the Evidentiary Hearing ("Evid. Hearing Tr.") are attached hereto as Exh. 10.

19.     Brown's deposition was consistent with this admission that surveillance of the Premises also did not yield any conclusive evidence of prostitution, such as "exchanging money for sex," and admitted that the number of individuals he saw entering the Premises was unusual but "not

conclusive specifically on drugs or prostitution." True and correct excerpts of the Deposition of Sam Brown ("Brown Depo") are attached hereto as Exh. 11.

20.     Finally, in neither of the approximately 1,300 pages of emails and other electronic communications with his lovers and sex partners, there is no evidence as if Defendant's roommate solicited anyone of them to have sex for money or other financial benefits.

21.     This statement has no basis because numerous emails and other electronic messages from Defendant's roommate to his guests instruct them to "plz be quiet" as they enter the building, along with requests to remove their shoes outside the apartment, presumably to keep the Subject Premises neat and clean. A true and correct copy of a sample of these electronic communications that were production to Plaintiff are attached hereto as Exh. 12.

22.     It should also be noted that Plaintiff knew well in advance of the expert disclosure deadlines that Faustini would provide expert testimony because Defendant submitted Faustini's declaration regarding the identical issues covered in his expert report on April 13, 2018, in support of his opposition to Plaintiff's Motion for a Preliminary Injunction. A true and correct copy of Faustini's April 13, 2018 declaration is attached hereto as Exh. 13.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct of my own personal knowledge and as to such matters, I am informed and believe that they are true and correct.

Executed on January 28, 2019 at San Francisco, California

_/s/ Yosef Peretz_
Yosef Peretz

# EXHIBIT 1

David Garibaldi

| | |
|---|---|
| **From:** | David Garibaldi |
| **Sent:** | Wednesday, September 12, 2018 4:08 PM |
| **To:** | 'gwalston@walstonlaw.com' |
| **Cc:** | Yosef Peretz |
| **Subject:** | RE: 640 Octavia v. Pieper |

Greg,

We never received a response from you regarding the Stipulation I sent you last Friday. Your lack of response has forced us to make numerous filings with the Court to safeguard our rights. Please get back to us ASAP so we can get this issue resolved.

**David Garibaldi**
**PERETZ & ASSOCIATES**
22 Battery Street, Suite 200
San Francisco, CA 94111
Tel.     415.732.3777 x 108
Dir.     415.534.6240
Fax     415.732.3791
Email   dgaribaldi@peretzlaw.com;
www.peretzlaw.com

**From:** David Garibaldi
**Sent:** Friday, September 07, 2018 11:29 AM
**To:** gwalston@walstonlaw.com
**Cc:** Yosef Peretz <yperetz@peretzlaw.com>
**Subject:** RE: 640 Octavia v. Pieper

Greg,

Attached is a draft stipulation.

**David Garibaldi**
**PERETZ & ASSOCIATES**
22 Battery Street, Suite 200
San Francisco, CA 94111
Tel.     415.732.3777 x 108
Dir.     415.534.6240
Fax     415.732.3791
Email   dgaribaldi@peretzlaw.com;
www.peretzlaw.com

**From:** gwalston@walstonlaw.com <gwalston@walstonlaw.com>
**Sent:** Friday, September 7, 2018 10:33 AM
**To:** David Garibaldi <dgaribaldi@peretzlaw.com>
**Subject:** RE: 640 Octavia v. Pieper

David

1

Sorry I'm just getting back, I'm out of the office today and my reception is sporadic.  In any event, I'm always happy to provide an extension of time, but now that the motion is filed I'm not sure it's so easy.  Under the circumstances, it might be best if you could send me a proposed stipulation so I can run it by the client?  Thanks!

Best,
Greg

---

**From:** David Garibaldi <dgaribaldi@peretzlaw.com>
**Sent:** Thursday, September 6, 2018 4:09 PM
**To:** Greg Walston <gwalston@walstonlaw.com>
**Cc:** Yosef Peretz <yperetz@peretzlaw.com>
**Subject:** 640 Octavia v. Pieper

Hi Greg,

We just saw that you filed a Motion for Entry of Default in the case.  Could we please have an extension until tomorrow to file an Answer?  I apologize as I have been out of the country in the weeks before Labor Day and partially out sick upon my return, and didn't realize the time to file an Answer had lapsed.  I would appreciate the professional courtesy.

Thanks,

**David Garibaldi**
**PERETZ & ASSOCIATES**
22 Battery Street, Suite 200
San Francisco, CA 94111
Tel.    415.732.3777 x 108
Dir.    415.534.6240
Fax    415.732.3791
Email  dgaribaldi@peretzlaw.com;
www.peretzlaw.com

**EXHIBIT 2**

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Northern District of California ▾

640 OCTAVIA, LLC.,

*Plaintiff*

v.

Civil Action No. C-18-01047

KARL HEINZ PIEPER, et al;

*Defendant*

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

Redacted

To:
640 Octavia Street, San Francisco, CA 94102

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:

Listed on Attachment A to this document.

| Place: The Walston Law Group 4 Charlton Court San Francisco, CA 94123 | Date and Time: 11/08/2018 10:00 am |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: 09/21/2018

*CLERK OF COURT*

OR _____

*Signature of Clerk or Deputy Clerk*          *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* 640 OCTAVIA, LLC
, who issues or requests this subpoena, are:
Gregory S. Walston, The Walston Law Group, 4 Charlton Court San Francisco, CA 94123, gwalston@walstonlaw.com, (41 ) 956 9200

## Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No. C-18-01047

## PROOF OF SERVICE

*(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❑ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❑ I returned the subpoena unexecuted because: _____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: _____     _____
                                         *Server's signature*

                                _____
                                         *Printed name and title*

                                _____
                                         *Server's address*

Additional information regarding attempted service, etc.:

  
AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:

(A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or

(B) within the state where the person resides, is employed, or regularly transacts business in person, if the person

(i) is a party or a party's officer; or

(ii) is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:

(A) production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and

(B) inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2** *Command to Produce Materials or Permit Inspection.*

(A) *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

(B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

(i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.

(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*

(A) *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

(i) fails to allow a reasonable time to comply;

(ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);

(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

(iv) subjects a person to undue burden.

(B *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

(i) disclosing a trade secret or other confidential research, development, or commercial information; or

(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.

(C) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

(ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:

(A) *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

(B) *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

(C) *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

(D) *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2) Claiming Privilege or Protection.**

(A) *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

(i) expressly make the claim; and

(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

(B) *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**

The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## ATTACHMENT A

### I.   DEFINITIONS

1.    As used herein, the terms "YOU" or "YOUR" means **Redacted** and agents, employees, and all other persons acting or purporting to act on his behalf, including all present or former agents, employees, and all other persons exercising or purporting to exercise discretion and/or make decisions on behalf of **Redacted**

2.    As used herein, the terms "DOCUMENT" and "DOCUMENTS" have the same meaning and are equal in scope to the terms "documents" and "electronically store information" as stated in Federal Rule of Civil Procedure 34(a) and include all tangible things, writings, drawings, graphs, charts, photographs, sound and video recordings, images, and other data or data compilations—stored in any medium from which information can be obtained either directly or, if necessary, after translation by the responding party into a reasonably usable form.

3.    As used herein, the term "any" means "any and all"

4.    "640 OCTAVIA" means the real property located at 640 Octavia Street, San Francisco, CA 94102.

### II.   LIST OF DOCUMENTS

5.    Any and all DOCUMENTS and communications, electronic or otherwise, including but not limited to, emails, text messages, instant messages, photographs, or videos, YOU sent, received, or posted to or from any social media site, dating site or application, or message board or forum, including but not limited to Tinder, Grinder, Adam4Adam, Hornet, Scruff, KIK, WhatsApp, Google Hangouts, and Craigslist, regarding agreements to meet and/or encounter at 640 OCTAVIA.

6.    Any and all DOCUMENTS and communications, electronic or otherwise, including but not limited to, emails, text messages, instant messages, photographs, or videos, YOU sent, received, posted, or downloaded, to or from any social media site, dating site or application, or message board or forum, including but not limited to Tinder, Grinder,

Adam4Adam, Hornet, Scruff, KIK, WhatsApp, Google Hangouts, and Craigslist, regarding proposed and/or actual sexual encounters taking place at 640 OCTAVIA.

    7.      Any and all DOCUMENTS and communications, electronic or otherwise, exchanged between YOU and Karl Heinz Pieper regarding 640 OCTAVIA.

    8.      Any and all DOCUMENTS and communications, electronic or otherwise, exchanged between YOU and Karl Heinz Pieper regarding any events relating to this litigation that took place at 640 OCTAVIA.

    9.      Any and all DOCUMENTS and communications, electronic or otherwise, exchanged between YOU and Karl Heinz Pieper regarding Ed Kountze, Jean Boldan, Justin Huzzo, Sam Brown, or Itamar Herzberg.

    10.    Any and all DOCUMENTS and communications, electronic or otherwise, exchanged between YOU and Karl Heinz Pieper or any other individual, other than YOUR attorney, regarding the number of guests YOU invited to 640 OCTAVIA.

    11.    Any and all DOCUMENTS and communications, electronic or otherwise, exchanged between YOU and Karl Heinz Pieper or any other individual, other than YOUR attorney, regarding complaints received from Ed Kountze or any other individual regarding the number of guests YOU invited to 640 OCTAVIA.

    12.    Any and all DOCUMENTS and communications, electronic or otherwise, exchanged between YOU and Karl Heinz Pieper regarding the incident concerning the individual identified in YOUR deposition at 45:5-46:22, as "Miguel".

    13.    Any and all DOCUMENTS and communications, electronic or otherwise, exchanged between YOU and the individual identified in YOUR deposition at 45:5-46:22, as "Miguel".

    14.    Any and all DOCUMENTS and communications, electronic or otherwise, identifying or regarding conversations that Karl Heinz Pieper had with any individual YOU invited to 640 OCTAVIA.

15. Any and all bank statements YOU have received or been issued during YOUR residency at 640 OCTAVIA.

16. Any and all credit or debit card statements YOU have received or been issued during YOUR residency at 640 OCTAVIA.

17. Any and all pay stubs YOU have received or been issued during YOUR residency at 640 OCTAVIA, including but not limited to those issued during YOUR employment with the Hector Estrada Salon, located at 142 Fillmore St, San Francisco, CA 94117.

18. Any and all tax documentation, including but not limited to forms 1099 and W-2, that YOU have filed with the IRS during YOUR residency at 640 Octavia.

19. Any Cosmetologist and/or Barber's license YOU hold in the State of California

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name and Address):*<br>Gregory Walston, 196776<br>The Walston Law Group<br>4 Charlton Court<br>San Francisco, CA 94123 | | TELEPHONE NO.:<br>(415) 956-9200 | | FOR COURT USE ONLY |
|---|---|---|---|---|
| ATTORNEY FOR *(Name):* Plaintiff | | Ref. No. or File No. | | |
| Insert name of court, judicial district or branch court, if any:<br>United States District Court, Northern District of California-Northern District of<br>450 Golden Gate Avenue<br>San Francisco, CA 94102-3483 | | | | |
| PLAINTIFF:<br>640 Octavia | | | | |
| DEFENDANT:<br>Karl Heinz-Pieper, et al. | | | | |
| **PROOF OF SERVICE** | DATE:<br>11/08/2018 | TIME:<br>10:00AM | DEPT/DIV: | CASE NUMBER:<br>3:18-cv-1047-WHA |

**BY FAX**

1. At the time of service I was a citizen of the United States, over 18 years of age and not a party to this action, and I served copies of:
Subpoena To Produce Documents, Information, Or Objects, Federal Rule of Civil Produce 45, Attachment A

2. Person Served (name): Redacted(by personal service)

3. Date and Time of Delivery: 10/27/2018    8:07AM

4. Address where served: 640 Octavia Street
San Francisco, CA 94102

5. I received the above document(s) for service on (date): 10/18/2018

6. Witness Fees: Witness fees and mileage both ways were not demanded or paid.

Fee for service (including Witness Fees if paid) $: 75.00

Registered California process server.
County: San Francisco
Registration No.: 2018-0001400
Expiration: Jonathan P. McBride

One Legal - 194-Marin
504 Redwood Blvd #223
Novato, CA 94947
415-491-0606

I declare under penalty of perjury under the laws of the United States of
America and the State of California that the foregoing is true and correct and
that this declaration was executed on 10/29/2018 at Los Angeles, California.

Jonathan P. McBride
OL# 12412133

# EXHIBIT 3

David Garibaldi

---

| | |
|---|---|
| **From:** | David Garibaldi |
| **Sent:** | Thursday, December 13, 2018 4:13 PM |
| **To:** | 'gwalston@walstonlaw.com' |
| **Cc:** | Yosef Peretz |
| **Subject:** | RE: 640 Octavia v. Pieper |
| **Attachments:** | Resp to Subpoena - Redacted.pdf |

Greg,

I am not sure what prior correspondence you're referring to, but there is certainly flexibility on that issue from our side.  Had you sought our position prior to filing your motion, I have no doubt this could have been resolved without court action.

To that end, please find attached to this email Mr. Redacted's responses and objections to the subpoena's document requests, and, at the end of this email, a link to a Dropbox folder containing Mr. Redacted's responsive document production.  The production consists of over 1300 pages of electronic communications and we believe it is the fullest extent of communications with his sexual partners that he is able to provide at this time.  Please also be advised that names, images, and contact information of third parties have been redacted in order to protect their privacy given the nature of the information.

We would hope that this document production demonstrates our intent to continue to meet and confer and engage in the discovery process, and that it is enough to persuade you to withdraw your motion at this time.  We will be filing an opposition to the motion as our deadline is tomorrow, but are glad to continue to meet and confer.

As for Ms. Hite's deposition, we are fine with rescheduling it for a time after the holidays so long as Plaintiff waives any objection that it is being taken after the discovery cutoff.  Please provide us with her availability in January 2019.  However, please be aware that we also issued a subpoena for Mayra Mira's deposition on December 17, and gave you ample notice of that deposition.  Mayra Mira has agreed to attend her deposition on December 17, so we will be proceeding with her deposition that day as you did not timely object.

Finally, please let me know if there are any issues with accessing the documents at the link below, as the file size was quite large:

https://www.dropbox.com/sh/l9ud0kugvcvgi49/AACSlV2u_51TTc-eS9RZFEELa?dl=0

Thanks,

**David Garibaldi**
**PERETZ & ASSOCIATES**
22 Battery Street, Suite 200
San Francisco, CA 94111
Tel.    415.732.3777 x 108
Dir.    415.534.6240
Fax    415.732.3791
Email   dgaribaldi@peretzlaw.com;
www.peretzlaw.com

**From:** gwalston@walstonlaw.com [mailto:gwalston@walstonlaw.com]
**Sent:** Thursday, December 13, 2018 10:04 AM
**To:** David Garibaldi <dgaribaldi@peretzlaw.com>
**Cc:** Yosef Peretz <yperetz@peretzlaw.com>
**Subject:** RE: 640 Octavia v. Pieper

David

Sorry I'm just getting back to you.  As you know, this has been a busy week on this case.

I would like to take you up on your efforts to meet and confer on the subpoena to Mr. Redacted.  While I respectfully disagree that this is required under L.R. 37 (inasmuch as this motion is not brought under Rule 37), I certainly would appreciate the opportunity to see how much progress we can make towards working this out.  Based on my previous conversations with your office on this matter, it is my understanding that Mr. Redacted is unwilling to make his full electronic correspondence with his sexual partners available to us.  However, if there is some flexibility on that issue, we should definitely explore it.

One last thing.  Unfortunately, I have a conflict on December 17, the date currently noticed for Ms. Hite's deposition.  Would it be possible to reschedule it for a time after the holidays?  Of course, I am willing to waive any objection that the deposition is taken after the percipient discovery cutoff.

Thank you for your consideration.

Best,
Greg

**From:** David Garibaldi <dgaribaldi@peretzlaw.com>
**Sent:** Monday, December 3, 2018 4:34 PM
**To:** gwalston@walstonlaw.com
**Cc:** Yosef Peretz <yperetz@peretzlaw.com>
**Subject:** RE: 640 Octavia v. Pieper

Greg,

Thank you.  Your office should receive a hard copy of the subpoena tomorrow.  We are happy to meet and confer on a mutually agreeable date and time, just let us know.

Additionally, we noticed that you filed a Motion to Compel  Redacted  to comply with a subpoena to produce numerous categories of documents.  We would like to meet and confer over the scope of the documents requested by the subpoena and Mr. Redacted's production thereto.  We apologize for overlooking the subpoena and not addressing it in a timely manner, but it was not served through our office and you did not separately provide us with notice of its existence or Mr. Redacted's failure to timely comply.  Note that Civil Local Rule 37-1 requires that parties meet and confer to resolve all discovery-related disputes before the Court will even entertain a Motion to Compel discovery.  We will get you our substantive position on the scope of the subpoena by no later than the end of the week.

Thanks,

**David Garibaldi**
**PERETZ & ASSOCIATES**
22 Battery Street, Suite 200
San Francisco, CA 94111
Tel.    415.732.3777 x 108

# EXHIBIT 4

**From:** Greg Walston [mailto:gwalston@walstonlaw.com]
**Sent:** Thursday, December 13, 2018 4:18 PM
**To:** David Garibaldi <dgaribaldi@peretzlaw.com>
**Cc:** Yosef Peretz <yperetz@peretzlaw.com>
**Subject:** Re: 640 Octavia v. Pieper

David

I never reviewed a copy of the subpoena on Ms. Mira, and the last correspondence indicated only that you were working on confirming a date and time. What time was it set for?

Best,
Greg

On Dec 13, 2018, at 4:13 PM, David Garibaldi <dgaribaldi@peretzlaw.com> wrote:

> Greg,
>
> I am not sure what prior correspondence you're referring to, but there is certainly flexibility on that issue from our side.  Had you sought our position prior to filing your motion, I have no doubt this could have been resolved without court action.
>
> To that end, please find attached to this email Mr. <sup>Redacted</sup>'s responses and objections to the subpoena's document requests, and, at the end of this email, a link to a Dropbox folder containing Mr. <sup>Redacted</sup>s responsive document production.  The production consists of over 1300 pages of electronic communications and we believe it is the fullest extent of communications with his sexual partners that he is able to provide at this time.  Please also be advised that names, images, and contact information of third parties have been redacted in order to protect their privacy given the nature of the information.
>
> We would hope that this document production demonstrates our intent to continue to meet and confer and engage in the discovery process, and that it is enough to persuade you to withdraw your motion at this time.  We will be filing an opposition to the motion as our deadline is tomorrow, but are glad to continue to meet and confer.
>
> As for Ms. Hite's deposition, we are fine with rescheduling it for a time after the holidays so long as Plaintiff waives any objection that it is being taken after the discovery cutoff.  Please provide us with her availability in January 2019.  However, please be aware that we also issued a subpoena for Mayra Mira's deposition on December 17, and gave you ample notice of that deposition.  Mayra Mira has agreed to attend her deposition on December 17, so we will be proceeding with her deposition that day as you did not timely object.
>
> Finally, please let me know if there are any issues with accessing the documents at the link below, as the file size was quite large:
>
> https://www.dropbox.com/sh/l9ud0kugvcvgi49/AACSlV2u_51TTc-eS9RZFEELa?dl=0
>
> Thanks,
>
> **David Garibaldi**
> **PERETZ & ASSOCIATES**
> 22 Battery Street, Suite 200

San Francisco, CA 94111
Tel.     415.732.3777 x 108
Dir.     415.534.6240
Fax     415.732.3791
Email   dgaribaldi@peretzlaw.com;
www.peretzlaw.com

**From:** gwalston@walstonlaw.com [mailto:gwalston@walstonlaw.com]
**Sent:** Thursday, December 13, 2018 10:04 AM
**To:** David Garibaldi <dgaribaldi@peretzlaw.com>
**Cc:** Yosef Peretz <yperetz@peretzlaw.com>
**Subject:** RE: 640 Octavia v. Pieper

David

Sorry I'm just getting back to you.  As you know, this has been a busy week on this case.

I would like to take you up on your efforts to meet and confer on the subpoena to Mr. <sup>Redacted</sup>  While I respectfully disagree that this is required under L.R. 37 (inasmuch as this motion is not brought under Rule 37), I certainly would appreciate the opportunity to see how much progress we can make towards working this out.  Based on my previous conversations with your office on this matter, it is my understanding that Mr. <sup>Redacted</sup> is unwilling to make his full electronic correspondence with his sexual partners available to us.  However, if there is some flexibility on that issue, we should definitely explore it.

One last thing.  Unfortunately, I have a conflict on December 17, the date currently noticed for Ms. Hite's deposition.  Would it be possible to reschedule it for a time after the holidays?  Of course, I am willing to waive any objection that the deposition is taken after the percipient discovery cutoff.

Thank you for your consideration.

Best,
Greg

**From:** David Garibaldi <dgaribaldi@peretzlaw.com>
**Sent:** Monday, December 3, 2018 4:34 PM
**To:** gwalston@walstonlaw.com
**Cc:** Yosef Peretz <yperetz@peretzlaw.com>
**Subject:** RE: 640 Octavia v. Pieper

Greg,

Thank you.  Your office should receive a hard copy of the subpoena tomorrow.  We are happy to meet and confer on a mutually agreeable date and time, just let us know.

Additionally, we noticed that you filed a Motion to Compel **Redacted** to comply with a subpoena to produce numerous categories of documents.  We would like to meet and confer over the scope of the documents requested by the subpoena and Mr. <sup>Redacted</sup>s production thereto.  We apologize for overlooking the subpoena and not addressing it in a timely manner, but it was not served through our office and you did not separately provide us with notice of its existence or Mr. <sup>Redacted</sup>s failure to timely comply.  Note that Civil Local Rule 37-1 requires that parties meet and confer to resolve all

discovery-related disputes before the Court will even entertain a Motion to Compel discovery.  We will get you our substantive position on the scope of the subpoena by no later than the end of the week.

Thanks,

**David Garibaldi**
**PERETZ & ASSOCIATES**
22 Battery Street, Suite 200
San Francisco, CA 94111
Tel.    415.732.3777 x 108
Dir.    415.534.6240
Fax    415.732.3791
Email   dgaribaldi@peretzlaw.com;
www.peretzlaw.com

**From:** gwalston@walstonlaw.com [mailto:gwalston@walstonlaw.com]
**Sent:** Monday, December 03, 2018 3:38 PM
**To:** David Garibaldi <dgaribaldi@peretzlaw.com>
**Subject:** RE: 640 Octavia v. Pieper

David

We'll accept service of the subpoena on her behalf.

Best,
Greg

**From:** David Garibaldi <dgaribaldi@peretzlaw.com>
**Sent:** Friday, November 30, 2018 2:24 PM
**To:** gwalston@walstonlaw.com
**Cc:** Yosef Peretz <yperetz@peretzlaw.com>
**Subject:** 640 Octavia v. Pieper

Hi Greg,

We would like to subpoena the deposition of Randi Hite.  Please indicate whether you are willing to accept service of a subpoena for her deposition, attached here.  If not, please let us know her most recent address.

Thanks,

**David Garibaldi**
**PERETZ & ASSOCIATES**
22 Battery Street, Suite 200
San Francisco, CA 94111
Tel.    415.732.3777 x 108
Dir.    415.534.6240
Fax    415.732.3791
Email   dgaribaldi@peretzlaw.com;
www.peretzlaw.com

**EXHIBIT 5**

| | |
|---|---|
| **From:** | David Garibaldi |
| **To:** | gwalston@walstonlaw.com |
| **Cc:** | Yosef Peretz |
| **Subject:** | 640 Octavia v. Pieper |
| **Date:** | Wednesday, December 19, 2018 11:16:58 AM |

Hi Greg,

I am following up regarding the deposition of Randi Hite.  Please provide her availability for a deposition in January 2019.

Thanks,

**David Garibaldi**
**PERETZ & ASSOCIATES**
22 Battery Street, Suite 200
San Francisco, CA 94111
Tel.     415.732.3777 x 108
Dir.     415.534.6240
Fax     415.732.3791
Email    dgaribaldi@peretzlaw.com;
www.peretzlaw.com

**EXHIBIT 6**

| From: | David Garibaldi |
|---|---|
| To: | gwalston@walstonlaw.com |
| Cc: | Yosef Peretz |
| Subject: | 640 Octavia v. Pieper |
| Date: | Friday, December 21, 2018 8:46:02 PM |
| Attachments: | Expert Disclosure.pdf |

Hi Greg,

Please find attached Defendant's expert disclosure in this matter.

Additionally, while I'm emailing you I'd like to remind you again to please get back to me about a date for Randi Hite's deposition. I know the holidays are a busy time, but our office calendar for January is becoming very busy so we really need to hammer down this date.

Thanks,

**David Garibaldi**
**PERETZ & ASSOCIATES**
22 Battery Street, Suite 200
San Francisco, CA 94111
Tel.    415.732.3777 x 108
Dir.    415.534.6240
Fax    415.732.3791
Email    dgaribaldi@peretzlaw.com;
www.peretzlaw.com

# EXHIBIT 7

Yosef Peretz (SBN 209288)
yperetz@peretzlaw.com
David Garibaldi (SBN 313641)
dgaribaldi@peretzlaw.com
PERETZ & ASSOCIATES
22 Battery Street, Suite 200
San Francisco, CA 94111
Tel: 415.732.3777
Fax: 415.732.3791

Attorneys for Defendant KARL-HEINZ PIEPER

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| 640 OCTAVIA, LLC | Case No. 3:18-cv-01047-WHA |
| Plaintiff, | **DEFENDANT'S KARL-HEINZ PIEPER'S LIST OF ISSUES ON WHICH EXPERT TESTIMONY SHALL BE OFFERED AT TRIAL** |
| v. | |
| KARL-HEINZ PIEPER and DOES 1-45, inclusive, | |
| Defendants. | |

DATE OF EXCHANGE:          November 21, 2018

PLACE OF EXCHANGE:          Via U.S. Mail

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

Pursuant to ¶ 4 of the Court's Case Management Order [Dkt. No. 30], Rules 16 and 26(a)(2) of the Federal Rules of Civil Procedure ("FRCP"), and Civil Local Rule 16-10, Defendant KARL-HEINZ PIEPER ("Pieper" or "Defendant") hereby identifies the following issues as those which Defendant expects to proffer expert testimony in his case-in-chief.

1.    Whether Plaintiff's Unlawful Detainer action against Pieper or Plaintiff's other endeavors to recover possession of Pieper's rental unit were made in good faith, without ulterior reason, and with honest intent to evict Pieper from his unit;

2.      Whether Plaintiff's Unlawful Detainer action against Pieper or Plaintiff's other endeavors to recover possession of Pieper's rental unit were motivated by the financial gain that Plaintiff would receive from effectuating Pieper's eviction;

3.      Whether Plaintiff's Unlawful Detainer action against Pieper or Plaintiff's other endeavors to recover possession of Pieper's rental unit were motivated by retaliation for Pieper's exercise of any of Pieper's rights under the law;

4.      The fair market value of the apartment building, if sold as-is, at issue that is owned by Plaintiff and is located at 640 Octavia Street, San Francisco, California 94102 (the "Building"), at the times that Plaintiff purchased the Building, filed the Unlawful Detainer action against Pieper, otherwise endeavored to recover possession of Pieper's rental unit, and at the present time;

5.      The fair market value of the Building, if sold without tenants, at the times that Plaintiff purchased the Building, filed the Unlawful Detainer action against Pieper, otherwise endeavored to recover possession of Pieper's rental unit, and at the present time;

6.      The fair market rent value of Pieper's unit, at the times that Plaintiff purchased the Building, filed the Unlawful Detainer action against Pieper, otherwise endeavored to recover possession of Pieper's rental unit, and at the present time;

Dated: November 21, 2018            PERETZ & ASSOCIATES

By: _____
       Yosef Peretz
       David Garibaldi
       Attorneys for Defendant
       KARL-HEINZ PIEPER

**EXHIBIT 8**

Yosef Peretz (SBN 209288)
yperetz@peretzlaw.com
David Garibaldi (SBN 313641)
dgaribaldi@peretzlaw.com
PERETZ & ASSOCIATES
22 Battery Street, Suite 200
San Francisco, CA 94111
Tel: 415.732.3777
Fax: 415.732.3791

Attorneys for Defendant KARL-HEINZ PIEPER

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| 640 OCTAVIA, LLC | Case No. 3:18-cv-01047-WHA |
| Plaintiff, | **PLAINTIFFS' EXPERT DISCLOSURE PURSUANT TO FRCP 26(a)(2)** |
| v. | |
| KARL-HEINZ PIEPER and DOES 1-45, inclusive, | |
| Defendants | |

Pursuant to Federal Rule of Civil Procedure ("FRCP") 26(a)(2), Defendant "KARL-HEINZ PIEPER ("Defendant" or "Pieper"), hereby designates the following retained expert witness:

**I.    Frank Jay Faustini, Jr.**

Qualifications:  Mr. Faustini is a real estate appraiser based in San Francisco and frequently serves as an expert conducting economic analysis of damages in landlord-tenant disputes, including but not limited to valuations and rent differentials.  A true and correct copy of Mr. Faustini's *curriculum vitae* is attached hereto as Exhibit 1.  A true and correct copy of Mr. Faustini's report is attached hereto as Exhibit 2.

Dated: December 21, 2018                    PERETZ & ASSOCIATES

By:  */s/ Yosef Peretz*
Yosef Peretz
David Garibaldi
Attorneys for Defendant
KARL-HEINZ PIEPER

# EXHIBIT 1

# QUALIFICATIONS (CURRICULUM VITAE)

**Frank Jay Faustini Jr., J.D.**
**Residential Real Estate Appraiser**
2623 Eagle Ave.
Alameda, CA  94501
Phone: (415) 305 7974
jayfaustini@comcast.net

**EDUCATION:**

**Cornell University**, College of Arts and Sciences, Ithaca, New York

**B.A.**, Economics (1990)

**Northwest School of Law of Lewis & Clark College**, Portland, Oregon

**J.D.**, Certificate of Specialization in Environmental Law, (1996)

**PROFESSIONAL EXPERIENCE:**

*Real Estate Appraisal:*

**Sole Proprietor,**     San Francisco/Alameda, CA     Real Estate Appraiser
2007-Present
Developed residential appraisals and provided appraisal services in the San
Francisco Bay Area for litigation, asset evaluation, dissolution, estate and
mortgage purposes.  Provided estate consulting, litigation support and expert
testimony services to clients.

*Appraisal Firm Affiliations:*

**Grey Appraisal Associates,**  Pacifica, CA     Real Estate Appraiser
2014-2016
Chief San Francisco appraiser for firm specializing in appraisal services for
asset evaluation, dissolution, estate and litigation purposes.  Provided litigation
support for head of firm.

*Appraisal Firm Affiliations (cont.):*

**Think APAP,** Palo Alto, CA                              Real Estate Appraiser
2012-2013
Developed residential appraisals in the San Francisco Bay area.

**Audino & Associates,** San Francisco, CA          Real Estate Appraiser
2009-2011
Developed residential appraisals in the San Francisco Bay area.

**C&D Real Estate Appraisal, Inc.,** San Carlos, CA      Real Estate Appraiser
2008-2009
Developed residential appraisals in the San Francisco Bay area.  Provided
presentations to clients on appraisal process and regulations.

**Present Value LLC ,** San Diego, CA                   Real Estate Appraiser
2007-2011
Developed residential appraisals in the San Francisco Bay area.

**Alpine Appraisal Group,** Truckee, CA          Real Estate Appraiser Trainee
2002-2007
Developed residential appraisals in the North Lake Tahoe/Truckee area.
Experience includes 2-4 unit dwellings, reviews and Lake Tahoe lakefront
properties.  Completed all aspects of assignments on complex properties.


**EXPERT WITNESS:**

Qualified as an expert witness in California Superior Court, San Francisco
County

*Recent Expert Testimony:*

In re Marriage of Austin/Miller- Austin
Case number:  FDI-14-780775
San Francisco Superior Court
March 2017

In re Marriage of Lum/Chi
Case number:  FDI-09769130
San Francisco Superior Court
January 2017

**REFERENCES:**

Brian Grey, SRA        Certified Residential Appraiser
Pacifica, CA           (650) 355-7400

Andrea Kramer          Vice President / Senior Review Appraiser
Los Angeles, CA`       City National Bank
                       (714)328-2861

James E. Owen          Review Appraiser
El Toro, CA            JP Morgan Chase - Private Client Division
                       (949) 212-8522

Andrea Tameron         Certified Residential Appraiser
San Francisco, CA      (415) 235-2352

Andrei Fintescu        Certified Residential Appraiser
Sacramento, CA         (415) 305-6551

# EXHIBIT 2

 # Faustini Appraisal Services

April 13, 2018

David Garibaldi, Esq.
Peretz & Associates
22 Battery Street, Suite 200
San Francisco, CA 94111
Phone: (415) 732-3777 x 108, (415) 534-6240
E-mail: dgaribaldi@peretzlaw.com

Re:  640 Octavia St., San Francisco, CA  94102

Dear Mr. Garibaldi,

At your request, I have undertaken and completed an analysis of relative market value for the above referenced property.  The above referenced property is also identified as a portion of San Francisco County Assessor's Parcel No. 0793-022.  You are my Client in this matter and the intended user of this report.  The intended use of the appraisal is to assist you in the performance of your duties as counsel.

The purpose of analysis is to estimate, as of April 12, 2018, the relative market value of: (i) the referenced property with the presence of the current long term tenancy (with a controlled rent significantly below market rent); as compared to (ii) the hypothetical condition of the property having no such tenancy.

Market value is defined by The Dictionary of Real Estate Appraisal as: **"The most probable price as of a specified date, in cash, or in terms equivalent to cash, or in other precisely revealed terms, for which the specified property rights should sell after reasonable exposure in a competitive market under all conditions requisite to a fair sale, with the buyer and seller each acting prudently, knowledgeably and, for self-interest, and assuming that neither is under duress."**  The function of this analysis is to serve in the settlement of landlord tenant issues.  The analysis was conducted to follow your request and was performed in accordance with the Uniform Standards Of Professional Appraisal Practice.

As a result of my investigation and analyses of data gathered during this assignment, it is my opinion that, as of April 12, 2018, (i)  the market value of the property under the hypothetical condition that Unit #3 is vacant; is significantly higher than (ii) the "as is" market value of the subject property encumbered with the current tenancy of Unit #3.

Respectfully Submitted,

*Frank J. Faustini Jr.*

Frank J. Faustini Jr.
AL042426

**Faustini Appraisal Services**
**PO Box 2692**
**Alameda CA  94501**
**(415) 305-7974**
jayfaustini@comcast.net

 **Faustini Appraisal Services**

**SCOPE OF WORK:**

The Client has requested a current analysis of the market value of the subject property, 640 Octavia St.

The Client has requested the appraiser to provide opinion of the relative value of the subject property under the following conditions:

(i)  the "as is" market value of the property with the current tenancy of Unit #3, with its controlled rent; as compared to
(ii) the market value of the property under the hypothetical condition that Unit #3 is vacant.

The difference between these values requires the making of determinations concerning rental value, or, market rent.  The definition of rental value, or, market rent, used in this analysis is from The Dictionary of Real Estate Appraisal:  **"The rental income that a property would most probably command in the open market; indicated by current rents paid and asked for comparable space as of the date of appraisal."**

The Scope of Work is the type and extent of research and analyses performed in an appraisal assignment that is required to produce credible assignment results, given the nature of the appraisal problem, the specific requirements of the intended user(s) and the intended use of the appraisal report.

The Scope of Work for this appraisal assignment is defined by the complexity of this appraisal assignment and the reporting requirements of the Client, including the above definitions of market value/market rent, and certifications below.  The appraiser has: (1) inspected the neighborhood, (2) researched, verified, and analyzed data from reliable public and/or private sources, and (3) reported the analysis, opinions and conclusions in this appraisal report.

Note:  The Client has not requested an opinion of current market value of the subject property. The opinions offered in this report concern only relative values between actual and hypothetical conditions of the subject.  This report should not be considered, in any way, to be an opinion of actual market value of the subject.

# Faustini Appraisal Services

**NEIGHBORHOOD CHARACTERISTICS:**

The subject is located in the Hayes Valley district within the City of San Francisco.  The subject's immediate area consists of an urban mix of single family, 2-4 units and multi-family residences of good quality and appeal as well as commercial properties.  Neighborhood commercial uses are predominately retail and are concentrated along Hayes St. and Haight St. Subject is in close proximity to schools, shopping, hospitals, parks and employment. The San Francisco Central Business District is approximately 2 miles to the Northeast.

**SUBJECT PROPERTY CHARACTERISTICS:**

No inspection of the subject property was performed.  The appraiser has relied upon information from the Client, county records, other publically available information and the relatively recent MLS listing of the subject property in connection with its last sale on December 22, 2016.  This prior sale was for $2,400,000 (Realist Doc#K378678).  It appears to have been an arms length transaction (San Francisco Association of Realtors MLS#451561).

The subject is located in the Hayes-Gough Neighborhood Commercial Transit zoning district. Its current four unit use is an allowable use.  As of the effective date, the highest and best use of the subject property, as improved, is concluded to be as a four unit residential income property.

The subject is a four unit property with 3 one bedroom units and a two bedroom unit.

The subject structure is a Edwardian-Row style four unit income residence constructed in 1923, containing of 3 one bedroom units and a two bedroom unit.  It consists of two stories above a ground level garage.  The garage has parking for four cars.   The recent MLS listing for the subject also notes additional unpermitted rooms/unit.   Analysis of the relative relationship between the values described above do not require a detailed analysis of the condition of the subject property, as the relative difference being analyzed assumes no difference in the condition of the property.

Per information provided by the Client and verified with the recent MLS listing of the subject, subject property's Unit #3 is currently rented to a long term tenant with a controlled rent significantly below current market levels.  Per the Client, the tenancy is currently approximately 25 years old and has a controlled rent of $992.  The 2016 MLS listing notes a slightly lower rent for this unit of $981, which demonstrates a recent rental increase and indicates that the current rent is at the maximum allowable level.

The appraiser assumes that the subject has no physical deficiencies or adverse conditions and that all major systems are functional.



# Faustini Appraisal Services

**PROCESS**:

The terms of this assignment were defined earlier in this report.

In order to form a basis for estimating the difference between two above defined values of the subject property, analysis of both the current market rent of Unit #3 and the market value of the entire property is necessary.

Unit #3 Rent:

Unit #3 is a one bedroom unit.  Research was conducted concerning rentals of one bedroom units in the subject's immediate market area of the Hayes Valley district.  Listed below is a summary of the results of this research.

The rental listing site with the highest volume of local listings, Craigslist.org, currently has 65 listings of one bedroom properties marketed within the Hayes Valley district.  (However this figure does include numerous re-postings of the same units.)  The listings range in asking price from $2,590 to $5,400, with predominate value above $4,000.  A review of other rental listing sites containing approximately 20 (Hotpads) and 30 (Zillow) one bedroom listings in the district also found no current listings with a asking rent below $2,500.

Given the current range of the one bedroom rental market within the Hayes Valley district, it can be concluded that Unit #3's current rent of $992 is less than 50% of the units' current market rent.

Relative Market Value:

In order to determine the effect upon the subject's market value of Unit #3's controlled rent.  The appraiser relied upon and reviewed his appraisal files which contain extensive prior analysis of similar 2-4 unit properties with the subject's extended market area (including the subject Hayes Valley district and the nearby and competing districts).  A review this market data indicates that in every sale analyzed which contained a unit with a controlled rent significantly below market value (below 50%), a discernable effect upon the sales price can be identified.  The range of this effect defined by this data, as a percentage of sales price is 2% to over 10% per unit.  No sales were found that indicated the presence of a significantly below market rent tenancy had little to no effect upon sales price

The analysis indicates that within the subject's market area, 2-4 unit buildings with vacant units (or owner occupied units delivered vacant) have greater market appeal than buildings containing units with controlled rents significantly below current market rates.



# Faustini Appraisal Services

**CONCLUSION:**

After application of appropriate analysis and considering the elements which affect market values, it is my opinion that, as of April 12, 2018:  there is a significant difference between (i) the market value of the subject property under the hypothetical condition that Unit #3 was vacant; and (ii) the market value of the property with Unit #3 being delivered to the buyer with the current tenancy intact;  with (i) being higher than (ii) by a significant percentage of at least 2%.


Notes:
The subject's estimated exposure time, as of the effective date, was under 3 months.
Signatures contained herein are digitally computer generated. This is an appraisal report.



Very Truly Yours,

Frank J. Faustini Jr.
AL042426

# Faustini Appraisal Services

**CERTIFICATION: The Appraiser(s) certifies and agrees that:**

1.  The Appraiser has no present or contemplated future interest in the property appraised, and neither current or future employment, nor compensation for performing this appraisal, is contingent upon the appraised rental value of the property.

2.  The Appraiser has performed no services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.

3.  The Appraiser has no personal interest in or bias with respect to the subject matter of the appraisal report or the participants to the assignment.  The opinions contained in this report are not based in whole or in part upon the race, color or national origin of the prospective owners or occupants of the property under assignment or occupants of the properties in the vicinity of the property appraised.

4. The Appraiser has not personally inspected the subject property.  To the best of the Appraiser's knowledge and belief, all statements and information in this report are true and correct, and no significant information has been knowingly withheld.

5.  All contingent and limiting conditions are contained herein (imposed by the terms of the assignment or by the undersigned affecting the analyses, opinions and conclusions contained in the report).

6.  This report has been made in conformity with and is subject to the requirements of the Uniform Standards of Professional Appraisal Practice.

7.  All analysis, conclusions and opinions concerning the real estate that are set forth in the appraisal report were prepared by the Appraiser whose signature appears on the appraisal report and were prepared in an impartial and unbiased manner. No change of any item in the appraisal report shall be made by anyone other than the Appraiser, and the Appraiser shall have no responsibility for any such unauthorized change.

8.  The engagement and compensation for this assignment was not contingent upon the reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value estimate, the attainment of a stipulated result, or the occurrence of a subsequent event.

9.  Any data mentioned and/or collected during my investigation that has not been included in this report will be retained in the office file; said file is incorporated herein by reference and is an integral part hereof.

10.  No one provided significant assistance in the preparation of this appraisal.

Signed,

Frank J. Faustini Jr.
AL042426

**EXHIBIT 9**



**Ron Martinelli, PhD, CMI-V**
LAW ENFORCEMENT EXPERT
CERTIFIED MEDICAL INVESTIGATOR
FEDERAL/STATE COURTS QUALIFIED

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**640 OCTAVIA**

**VS**

**KARL HEINZ-PIEPER, DOES ONE, through FORTY-FIVE, inclusive,**

**Defendants**

**Case No. 3:18-cv-01047-WHA**

**Report of Plaintiffs' Premises Liability Expert, Ron Martinelli, Ph.D., CLS**

I have been retained by the Law Offices of The Walston Group, PC, and Attorney Gregory S. Walston, Esq., as an expert witness in the above civil action. I am therefore submitting the following information and accompanying documents in support of the opinions and conclusions expressed in this report.

I have spent over twenty-two years as an active police officer and detective. Additionally, I have directed a California Criminal Justice Training Center and Basic Law Enforcement Academy.

I possess a doctorate degree (Ph.D.) in Criminology with emphasis in forensic psychology and a Master's degree in Public Administration with emphasis in Justice Administration (MPA/JA) and a specialization in municipal government consulting.

I am a former adjunct professor of Forensic Science at National University – San Diego where I have instructed in the University's Masters in Forensic Science program. I am a former adjunct professor of Forensic Psychology at Argosy University – San Francisco and a former adjunct professor of Criminology at California Polytechnic State University – San Luis Obispo. Since 1978, I have also been a credentialed instructor or adjunct professor of law enforcement, police practices, forensics and the administration of justice at numerous accredited universities and colleges in California, Nevada and Florida.

I am a member in good standing with the American College of Forensic Examiners Institute (ACFEI), where I have presented nationally as an expert in police practices, forensics, crime scene analysis and force investigations.

310 South Maple Street • Suite C • Corona, Ca 92880
125 Richter Street • Boerne, Texas 78006-1635 • www.martinelliandassoc.com
951-719-1450 • *mobile* 909-936-0694 • *fax* 951-501-2952 • Code3Law@martinelliandassoc.com

I am Board Certified in Forensic Traumatology by the American Academy of Experts in Traumatic Stress and the National Center for Crisis Management, where I also hold Diplomate Status. This certification indicates specific expertise in the areas of stress-induced incidents, and psychological/emotional trauma.

I am a Certified Litigation Specialist (CLS) in police and corrections litigation through Americans for Effective Law Enforcement (AELE) which is the largest law enforcement amicus curiae litigation defense organization in the nation. I maintain active participation in this professional organization, attending courses in police practices, investigations, forensics and civil rights laws pertaining to law enforcement encounters with the public.

I am either currently, or have been recently retained as a police practices and forensic expert for the U.S. Department of Justice's U.S. Attorney's Office, States Attorney General's Offices of Alaska, Oregon, Nevada, New Mexico, Nebraska, Illinois, West Virginia, Delaware and Vermont; the Cities of Portland, Sacramento, San Jose, Los Angeles, Long Beach, San Diego, Albuquerque, Denver, Colorado Springs, Salt Lake City, Miami Beach, Cleveland, Columbus, Richmond, VA, Schenectady, NY; and numerous other municipalities in California and Illinois.

I am currently a retained civil rights and forensic police practices expert for several nationally recognized law firms specializing in civil rights and police practices litigation representing both plaintiff and defendant agencies.

From 2005 – 2009, I was the independent Special Investigator for the City of Riverside (CA) Police Community Review Commission where I reviewed officer-involved shootings and in-custody deaths for this civilian body through the Office of Mayor.

I am a law enforcement/forensics expert for the U.S. Navy Department and the United States Marine Corps Judge Advocate General's (JAG) Office.

As a law enforcement officer and investigator, I have personally investigated, and/or supervised hundreds complex crime scenes, recovering and documenting evidence from them. I investigate law enforcement cases in both field and corrections environments.

I May 2018, I was invited to present as a plenary speaker on reconciling the forensic evidence at the International Convention of the Association of Crime Scene Investigators in Nashville, TN. I was also presented with a Special Award by this body for my contributions to the forensic investigations community.

I am a former director of a California Commission on Peace Officer Standards & Training (POST) police and corrections academy, where I also served as Division Dean of Criminal Justice. In this position, I supervised a staff of over one hundred tenured and adjunct law enforcement faculty who instructed in police/corrections practices.

I am a member in good standing of the International Law Enforcement Educators and Trainers Association (ILEETA) and have presented to national and international law enforcement audiences on forensic investigations including the analysis of forensic evidence.

I have been a member of the American Security and Investigation Specialists (ASIS) organization for several years. This is the largest organization of security and

intelligence professionals in the world. I maintain an active practice in premises liability and security litigation.

I have received specialized training from FBI instructors from the Bureau's Behavioral Science Unit is criminal psychological profiling of homicides and sexual assaults. I have provided numerous criminal psychological profiles on suspects in public and work place environments to both law enforcement and the national news media. I am considered in the law enforcement, forensic, education, psychology/medical and media communities as a subject matter expert on this subject.

I am currently a retained forensics/law enforcement practices expert for the U.S. Department of Justice. I currently and have consulted with and/or trained numerous county, state and federal prosecutors; Assistant State Attorney Generals; Superior Court judges; and various professional training organizations including the California District Attorneys Association (CDAA) and the Center for Judicial Research & Education. I remain an active trainer and consultant within my areas of expertise.

As a police officer and an undercover investigator with the San Jose (CA) Police Department's Street Crimes Unit, I was assigned for several years to covertly investigate crimes involving street prostitution, pimping and pandering. My investigations entailed personal and team surveillance of suspected and known prostitutes as well as their locations of business and clients.

As an undercover investigator, I have been involved in hundreds of personal and team undercover operations where I contacted prostitutes and pimps to arrange for sexual encounters. I have learned about, testified to and written about how pimps and prostitutes conduct business and their various methods of operation; how they vet their clients; what they charge for their various sexual services; and how they avoid detection and arrest by law enforcement. I am aware of how prostitutes offer their sexual services via written and electronic social media.

During my time as an undercover investigator and a criminologist/researcher, I have personal field and research experience in understanding that prostitution is not a "victimless crime." In fact, I have conducted personal, vetted investigative and criminological research proving that there is significant ancillary crime directly associated with acts of prostitution including, but not limited to: coerced pimping and pandering, violent crimes such as murder, kidnapping, sexual assault, armed robbery, and assaults with deadly weapons. Additionally, prostitution is associated with threats, intimidation, gang activity, adult and juvenile sex trafficking, drug sales/distribution, protection rackets, black mail and property thefts.

I have either directly or assisted in the investigation and/or arrest of hundreds of prostitutes, pimps, sex traffickers and clients of prostitutes. I have testified as a subject matter expert on the subject of prostitution, pimping and pandering in Municipal and Superior Courts in Santa Clara County, CA.

As a doctoral (Ph.D.) student in criminology and forensic psychology, I personally conducted extensive, ethnographic research on adult and juvenile prostitution in the San Francisco Bay Area. I have personally interviewed hundreds of known and self-identified adult and juvenile prostitutes working within the straight and LGBT communities. Most of my research was conducted in the City of San Francisco. My

4

doctoral dissertation entitled, *"The Stroll – Dispelling the Myths of the World's Oldest Profession,"* was subsequently published as a popular text and received national and international media attention. This text was thoroughly vetted by the California Board of Corrections and was subsequently listed as recommended reading for all California State Parole Officers.

As a police officer, detective, law enforcement, and municipal government trainer and consultant, I have consulted with over three hundred law enforcement and criminal justice agencies and specialized military units. I have personally trained over 80,000 peace Officers and military personnel in my certified areas of instruction.

I have personally produced specialized law enforcement training approved by the California Board of Corrections Standards & Training for Corrections (STC), in the investigation of prostitution, pimping, pandering and sex trafficking for law enforcement agencies in California and Nevada. I am considered by the California Board of Corrections as a subject matter expert in these subjects.

I have conducted retained premises and security assessments for businesses, resort complexes, and residential complexes. I have conducted site inspections in numerous civil court cases where the issues of foreseeability and likelihood of occurrence of criminal acts were central case issues. I have also provided testimony on such assessment issues.

As a forensic criminologist, law enforcement, municipal government trainer and consultant, and a Federal/State Courts qualified police/corrections practices expert since 1993, I have been retained by county counsels, city attorneys, plaintiff attorneys, prosecutors, criminal defense attorneys and a state attorney general's office in nearly four hundred Federal and State Court cases.

I have been deposed and have testified in numerous federal and state civil and criminal actions; and have been designated by Federal and State Superior Court judges as a qualified authority in a number of law enforcement, forensic practices and premises liability and security cases.

As a Federal/State Courts qualified forensic police practices expert, the current statistics for my retention in officer-involved cases is 62% agency/officer defense; and 38% plaintiff, prosecutorial and/or court appointments.

The information and accompanying documents I have provided to the Court are truthful and accurate to the best of my knowledge.

Signed _____    Date: January 4, 2019

    Ron Martinelli, Ph.D., CLS

    Forensic Criminologist

    Federal/State Courts Qualified Police Practices Expert

    Premises Liability & Security Expert

*Report, Ron Martinelli, Ph.D., CLS*
*640 Octavia v. Heinz-Pieper, USDC Northern Dist. Case #3:18-cv-01047-WHA*

The plaintiff's legal counsel Gregory S. Walston, Esq., has requested that I prepare this declaration outlining my basic opinions in this case.

The findings and opinions I have reached to date have been formed from the information and discovery evidence provided to me in this case to date.

As is sometimes the occasion in cases such as this, I am aware that there could be additional documents and forensic evidence that might subsequently become available during the discovery process that I might wish to review, and which might assist me in developing more detailed findings and opinions. Therefore, I reserve the right to amend my findings and opinions at some later date based upon my ability to review any additional records and/or items of evidence I might subsequently receive.

## EXPERT'S TASKS

(1) Review the discovery evidence, analyze for a "totality of circumstances" determination as to whether there is a preponderance of evidence to believe that the plaintiff's allegations in his complaint are supported by circumstances, statements, facts and evidence.

(2) Summary of plaintiff's tort complaint and declaration allegations:[1]

   (a) Defendants Karl Heinz-Pieper and    Redacted    have an excessive number of unidentified visitors coming in and out of 640 Octavia building and apartment #3 which disturb the peace and safety of tenants in the building.
   (b) Defendants' visitors wander throughout the building unaccompanied and confront tenants.
   (c) Tenants feel threatened by unknown visitors found in the hallways and loitering in front of the apartment building.
   (d) Unknown visitors of the defendants' apartment 3 have attempted to open doors to other tenants' apartments; have attempted to break in to other tenants' apartments; have damaged locks.
   (e) A short-term tenant felt so threatened by unknown visitors to the defendants' apartment 3 that they locked themselves inside their apartment and would not venture outside.
   (f) Plaintiff is concerned that there is either narcotics and/or prostitution activity occurring in the defendants' apartment 3 which is a safety concern and a private nuisance.
   (g) Plaintiff is so concerned about tenant safety that they cannot rent the remaining apartments to prospective new tenants. This has caused an economic injury to them.

---

[1] Plaintiffs' allegations includes comments and concerns expressed to his retained private Investigator, Wit. Sam Brown.

*Report, Ron Martinelli, Ph.D., CLS*
*640 Octavia v. Heinz-Pieper, USDC Northern Dist. Case #3:18-cv-01047-WHA*

## MATERIALS REVIEWED FOR THIS ANALYSIS

1.    Court Document – Complaint; USDC Northern Dist. #3:18-cv-01047-WHA
2.    Court Document –    Redacted    Responses and Objections to Plaintiff's Subpoena to Produce Documents
3.    Court Document – Plaintiff's Motion for Preliminary Injunction
4.    Court Document – Declaration of Plaintiff Edward Kountz in Support of Motion for A Preliminary Injunction
5.    Court Document – Declaration of Witness Neil Martinson
6.    Court Document – Declaration of Witness Jean Boldan
7.    Court Document – Declaration of Witness Justin Hutto
8.    Court Document – Declaration of Witness Edward Kountz
9.    Court Document – Declaration of Witness Private Investigator Sam Brown
10.   Exhibits – Private Investigator Sam Brown CV
11.   Report – Investigative Report by PI Sam Brown, dated: 02-20-17
12.   Report – Supplemental Investigative Report by PI Sam Brown, dated: 02-26-17
13.   Report - Supplemental Investigative Report by PI Sam Brown, dated: 03-03-17
14.   Report - Supplemental Investigative Report by PI Sam Brown, dated: 03-11-17
15.   Report - Supplemental Investigative Report by PI Sam Brown, dated: 03-12-17
16.   Report - Supplemental Investigative Report by PI Sam Brown, dated: 04-09-17
17.   Report – (Exhibit C) CCTV Surveillance Date/Time Log: 640 Octavia Apt 3
18.   Records – Social Media text messages between    Redacted    and various unknown persons
19.   Records –   Redacted   W-2 2017

## DETAILS OF COMPLAINT AND INVESTIGATION

The plaintiff identified in this litigation is Mr. Edward Kountz (hereafter referred to as "Kountz"). Mr. Kountz states that he is part owner of an apartment building located at 640 Octavia Street in the City/County of San Francisco. The legal name attached to this tort is listed as "640 Octavia, LLC," which is a business.

The defendants identified in this tort are the primary apartment lease contract tenant Mr. Karl "Karrie" Heinz-Pieper (hereafter referred to as "Heinz-Pieper") and his roommate identified as    Redacted    (hereafter referred to as "Redacted").

Kountz relates that on or about September 9, 1993, Heinz-Pieper signed a residential lease agreement for Apartment 3 in the 640 Octavia building. Initially, the apartment was to be leased for a one year period, but subsequently transitioned to a month-to-month tenancy subject to the residential tenancy laws of the City of San Francisco.

Under the original signed lease agreement of 1993, the agreed upon lease restrictions inter alia were that the premise was for residential purposes only and not to be used to conduct any type of business. The agreed upon lease also restricted the premise to only

one occupant and stated that either party could terminate the lease upon violation of any of the restrictive clauses of the lease.[2]

Further, the apartment lease Rules and Regulations, as agreed upon and signed by defendant Heinz-Pieper, restricted the defendant(s) from disturbing residents after 10 pm and to refrain from having disruptive and threatening guests at any hour; or from distributing keys to non-tenants.

In or about December 2016, ownership in the apartment building was transferred to Kountz, who placed the premise into a Limited Liability Company now identified as "640 Octavia, LLC" in or about October, 2017.



Figure 1  Apartment building at 640 Octavia Street, San Francisco (CA)

Defendants Heinz-Pieper and Redacted state that Redacted moved into Apartment 3 at 640 Octavia in the Fall of 2014 and that Montoya has been the sole roommate residing there to this date. Redacted states that he shares rent with Heinz-Pieper in the amount of $725.00 a month which covers rent, utilities and cleaning services. (Dep. Heinz-Pieper, p. 29:23-25; Dep. Montoya, pp. 11:1-15, 11-13; 12:1-17; 67:14-23)

Defendant Heinz-Pieper states that Redacted never advised him upon moving in that he would have a large number of guests frequently visiting him. He states that he advised Redacted of the apartment rules which are posted in the kitchen that include: no noise,

---

[2] Lease Agreement, ¶ 7

*Report, Ron Martinelli, Ph.D., CLS*
*640 Octavia v. Heinz-Pieper, USDC Northern Dist. Case #3:18-cv-01047-WHA*

loud TV, radio or music; keep the apartment clean and orderly; clean up all dirty dishes. (Dep. Heinz-Pieper, pp. 30:6-9, 20 – 31:10-12)

Plaintiff Kountz states that the apartment building is secured in the front by a locked gate that requires either a key or a code to gain access into the building. (See Figure 1 photo of apartment building)

Kountz recalls that sometime after Redacted had moved into the building, he began to see an inordinate number of unknown individuals going in and out of the defendants' apartment, loitering and roaming the hallways and loitering in front of the building. Kountz represents that such activity had not been present prior to Redacted moving into the apartment building. He states that for the majority of the time period accounted for in this litigation, he and the defendants were the only tenants in the apartment building. Defendants Heinz-Pieper and Redacted resided upstairs in apartment 3.

Kountz describes the strangers as congregating downstairs in front of the building and appearing "menacing." He states that these individuals would often make threatening comments to him. He states that he felt threatened by them and was concerned for his safety and that of his partner identified as Jean Boldan (hereafter referred to as "Boldan"). Kountz states that neighbors residing in the immediate vicinity of his apartment building had also expressed concerns for their safety. (Dep. Kountz, pp. Dec. p. 2, ¶5, 7)

Kountz states that upon occasion, some strangers would force their way into the apartment building instead of waiting to be buzzed in by the defendants. He describes their activity as breaking locks, damaging parts of the premise and threatening other people who were in the building for legitimate reasons. (Dep. Kountz, pp. Dec. p. 2, ¶6)

Kountz relates that while the defendants were residing in apartment 3, he attempted to temporarily lease out one of the apartments to Neil Martinson (hereafter referred to as "Martinson"), but Martinson moved out because he felt threatened by the persons and the constant presence of unknown persons going in and out of the defendants' apartment and loitering outside the building. (Dep. Kountz, pp. Dec. p. 2, ¶7)

Witness Martinson states that he was a short-term tenant at the 640 Octavia apartment building for only one week from December 23 – 28, 2017. During that period, he stayed in Apartment 1. Martinson recalls that during his brief time there, he immediately noticed "significant traffic" from unknown people entering and exiting the defendants' apartment at all hours, particularly at late evening when he was trying to sleep. Martinson states that he observed significant activity by strangers who he knew did not reside in the building going up and down the rear stairs which was suspicious as if the people were trying to conceal their presence and activity from the landlord. (Dec. Wit. Martinson, p. 2, ¶3)

Martinson states that on several occasions, he observed groups of people loitering in front of the apartment building waiting to enter. At various times, he heard the people outside ringing all of the door bells for the other apartments to gain entry. He also noted that several locks on the building had been tampered with, apparently by people

attempting to gain access into the premise. Martinson's statement indicates that the foot traffic in and out of Apartment 3 was so frequent, brief and random that the people going in and out of the defendant's apartment had no legitimate business there.  He states that he was so concerned for his personal safety that he would lock himself inside of his apartment and would not venture outside. (Dec. Wit. Martinson, p. 2:¶3-5)

Witness Martinson's statements are supported by those of Witness Jean Boldan, who is Kountz's partner. Boldan states that she observed numerous problems associated with the defendants' Apartment 3 including what she describes as, "*an unusually high volume of people going in and out of (the apartment), randomly, at all hours of the day and night.*" (Dec. Wit. Boldan, p. 1:¶2)

Ms. Boldan states that she observed people to enter Apartment 3 and only stay for very brief periods of fifteen minutes so before leaving and that this activity was sustained for "many hours continuously." She states that the visitors seeking entry into the defendants' apartment cause disturbances by continuously ringing the buzzer to gain entry into the apartment building. (Dec. Wit. Boldan, p. 1:¶2)

Witness Boldan states that she observed strangers roaming the halls of the apartment building looking for unlocked doors. She states that she was personally threatened by the presence of these strangers who she also observed to be ingesting narcotics and threatening other people as well and did not feel safe within the apartment building. (Dec. Wit. Boldan, p. 2:¶3, 5)

Justin Hutto (hereafter referred to as "Hutto), is a neighbor who resides directly across the street from 640 Octavia. Witness Hutto's statements of his observations of the activities in front of and at the apartment building at 640 Octavia support those of plaintiff Kountz and witnesses Boldan and Martinson. According to Hutto, for well over a year from May 2017 through May 2018, he has observed, what he describes as, "disruptive and threatening" people loitering in front of and transiting in and out of the apartment building. He describes the movements of people going in and out of the plaintiff's building as random, brief and typically going on for hours at a time. (Dec. Wit. Hutto, p. 1:¶1-2)

Witness Hutto states that there are "literally over twenty people per day going in and out of the building, staying for only fifteen minutes or so and then leaving." He states that the people in the neighborhood refer to the 640 Octavia address as a "drug house," and he personally believes that drugs are being sold there. (Dec. Wit. Hutto, p. 1:¶2)

As was stated by plaintiff Kountz and Witnesses Boldan and Martinson, Witness Hutto states that he has been threatened by strangers who loiter in front of the plaintiff's apartment building at all hours of the day and night. He describes being yelled at and threatened on numerous occasions by these individuals. Mr. Hutto states that he has brought his complaints to the attention of defendant Heinz-Pieper, who has in turn advised him that he is not going to curtail the activity. (Dec. Wit. Hutto, p. 2:¶5

## EXPERT'S ANALYSIS FINDINGS AND OPINIONS

Forensic Investigation Methodology

In an effort in attempt to reconcile the plaintiff's complaint allegations with the circumstances, statements, facts and evidence for the purpose of reaching determinations, I conducted a standard fact finding forensic investigation involving several components. First, I extensively reviewed the aforementioned discovery evidence.

In addition, I also conducted a phone interview with Witness Sam Brown (hereafter referred to as "PI Brown"), who has been identified as a licensed private investigator retained by plaintiff Kountz to conduct a covert investigation. Witness Brown's investigation consisted of personal interviews with the plaintiff and at least one witness; personal surveillance of the 640 Octavia premise; and CCTV surveillance of the defendants' apartment.[3]

I reviewed all of PI Browns investigative reports, his date/time logs from his installed CCTV video surveillance of defendants' Apartment 3; as well as an extensive compilation of social media sites where defendant Redacted had placed ads offering sexual favors.

Statements

Karl Heinz-Pieper – States that the first time he was ever noticed by anyone that there were any problems or concerns about his apartment and roommate, Redacted was in or about November 2015 when he was first served with a Notice to Evict by the plaintiff. He states that prior to that time, plaintiff Kountz never mentioned any concerns he had regarding visitors, noise, disturbances or other activity associated with his apartment. Heinz-Pieper states that prior to being served by the plaintiff, he had no reason to believe that there were any issues of concerns about his apartment. (Dep. Heinz-Pieper, pp. 31:23-25; 32:3-, 11-12.)

Defendant Heinz-Pieper does concede that independently, from any alleged lack of notice from plaintiff and landlord Kountz, he was aware of at least two break-ins to Kountz's apartment and another separate time when he was aware that the front gate of the apartment building had been kicked in when temporary tenant Wit. Martinson was residing there. (Dep. Heinz-Pieper, p. 35:3-13, 16)

Heinz-Pieper states that he has no knowledge of strangers congregating or loitering in front of the apartment and has never witnessed, nor has any knowledge of any persons making any threats towards anyone associated with nor in the neighborhood of the apartment building. (Dep. Heinz-Pieper, pp. 39:3-5; 44:25)

---

[3] Phone interview with CA PI Sam Brown on 01-02-19 (unrecorded; written notes taken)

Heinz-Pieper states that he has never heard any loud noises nor disturbances coming from his apartment, nor the apartment building while he and Montoya have been there.

Redacted   – States that his sole employment is as a hair stylist. He currently is employed by the Hector Estrada Salon in Greenbrae, across the bay from San Francisco. He states that he works five days a week with Monday-Tuesdays off. (Dep. Montoya, pp. 14:11-12; 67:14-16)

Drug activity – Redacted denies using or being involved in illegal drugs. He asserts that he exercised regularly and is drug and disease free. (Dep. Redacted p. 75:12-24) Neither the plaintiff nor any of the witnesses, including PI Brown, have observed Redacted under the influence, in possession of or selling narcotics.

Sexual activity – Redacted admits to engaging in frequent sexual activity with persons known to him and random strangers who he refers to as "lovers." This is an incorrect term since a "lover" actually refers to one whom a person has a consistent sexual relationship. It is clear from Redacted own testimony and the forensic evidence of CCTV logs that the vast majority of his sexual encounters were with complete, random strangers whom he had never met and had only spent brief minutes with before they vacated his apartment. (Dep. Redacted pp. 20:17-19; 23:17 – 24:3; 27:25 – 28:2)

Redacted states that he submits ads on various social media sites/applications that are associated with sexual activity. He states that this is how he meets the people he has sexual encounters with. He specifically names Craigslist, Hornet, Adam4Adam, Grinder, Google Hangouts, WhatsApp and Scruff as the sites he has personally authored ads for sexual favors on. Redacted admissions are supported by the extensive ad and text messages Redacted and his sexual contacts have posted on the aforementioned social media sites offering sex. These social media sites are also regularly used by escort services, prostitutes, pimps and sex traffickers. (Dep. Redacted pp. 24:14-17, 23; 25:22-23; 24-25; 27:25 – 28:2)

Redacted states that there is no real routine to the manner in which he arranges his sexual encounters. He concedes that his frequent sexual encounters are with people he knows and with total random strangers. When pressed to identify the over 450 individuals private investigators have documented Redacted soliciting sex with, he could not specifically identify most of them. He only states that he "recognizes" a face but cannot identify any of them by name. Redacted concedes that he has a high volume of sexual encounters daily upon occasion. In fact, he concedes that at least on one occasions, he had fifteen sexual encounters in a day. (Dep. Redacted pp. 28:24 – 29:4; 30:3-5)

Redacted statements, including admissions and concessions regarding his prolific, frequent sexual encounters with persons he knows and total strangers; and the frequency of persons visiting his apartment for brief periods of time is consistent with and support the statements of plaintiff Kountz and witnesses Boldan, Martinson, Hutto and PI Brown.

12

Redacted _sexual persona and background_ – A total of 476 separate sexual solicitations authored by Jose Redacted listed and recovered on numerous social media sites known for hosting sexual encounters including prostitution, escort services and pimping/pandering, were reviewed.

Redacted self-described persona or moniker on sexual social media sites is "t4m," which is sexual jargon for *"Transvestite looking for men."* Redacted photograph appearing as a female appears on several of his ads soliciting sex, under the solicitation byline that reads, *"Young, sexy, passable, discrete fun girl looking to give head & more – t4m,"* or *"hot, safe, fun, sexy looking."*



Figures #2, 3 Redacted ads soliciting sex on Craigslist and Hornet sexual social media sites

The term "head" is sexual jargon for oral sex upon a man.

Redacted alias is "Jessica Wild." Documentation from his various ads on sex social media sites document that whenever Redacted communicates with the 100% of men who respond to his solicitation for sex, Redacted lists his personal cellular phone number of (415) 812-5556 and his home address as 640 Octavia, Apt. 3, San Francisco.

Redacted provides a description of his apartment building, how to enter the building and walk up to his apartment. He states that one accesses the interior of his apartment building through the front (locked) gate that leads to a second floor where apartments three and four are. (Dep. Redacted pp. 16:9-22; 17:3; 73:12 – 75:5)

A review of scores of text messages that Redacted has sent to people with whom he is going to engage in sex, he provides them with specific directions on how to access his apartment building, front gate and apartment. These text messages document a clear and consistent pattern of instruction to the vast amount of men Redacted has never met before that he has solicited for sex. It is clear from reading his text messages to these men that Redacted does not know who these men are, has never met them before and that they have never been to the 640 Octavia address previously. Redacted testimony of the description of how to access his apartment building and apartment 3 is consistent with the documented texts messages that capture those same descriptions.

Prostitution activity – Redacted denies that he is involved in acts of prostitution. He denies accepting money and/or gifts for his sexual favors. His statements indicate that he provides "free" sex because he is simply sexually active. (Dep. Redacted p. 76:15-25)

Sex partner rating scale – Redacted states that he rates his sexual encounter partners by placing a star next to their monikers. When shown the extensive list of individuals he has texted to solicit sexually, he states that if he really likes them sexually, or they are a person he has sex with regularly, he places a star next to their moniker. A review of these sexual encounter contacts shows that relatively few of Redacted sexual contacts have stars next to their social media monikers. (Dep. Redacted p. 35:2-4)

Complains about his activity – Redacted states that no one has ever complained to him about his activities, but they have complained to his roommate Heinz-Pieper who he refers to as "Kallie." He states that after receiving complaints from the plaintiff and perhaps others, Heinz-Pieper told him to minimize the number he had visiting the apartment and he complied with that request. Redacted states that after being advised to minimize his number of visitors, he would have only three to four over about three to four times a week. (Dep. Redacted pp. 35:18-22; 36:3-7; 37:13-18, 20; 38:1-4)

Redacted states that he "*always provides his sex partners with instructions; including 'I always tell them to be quiet, considerate and respectful'.*" He states that he "*always gives them clear instructions (indicating behavior)."* (Dep. Redacted pp. 39:19 – 40:12; 43:3-5; 44:10-11; 47:20)

Redacted assertion that he "always provides" his sex partners with "clear instructions" to be "quiet, considerate and respectful," is not supported by a review of hundreds of text messages authored by Redacted to the men he was soliciting for sex.

Redacted states that he is unaware of any other problems between any of his sexual partners, the plaintiff, other tenants in the apartment building, neighbors or other persons. (Dep. Redacted p. 47:2)


Statement of Witness PI Sam Brown – On the evening of January 2, 2019, I conducted a non-recorded telephone interview with Witness PI Sam Brown. I took contemporaneous hand written notes of our conversation.

Mr. Brown is a private investigator (PI) licensed by the State of California's Department of Consumer Affairs, Bureau of Investigative and Security Services (BSIS). He states that he was retained by plaintiff Kountz to covertly investigate the defendants Heinz-Pieper and Montoya and suspicious activities in and about the 640 Octavia apartment building and, specifically, the inner and outer access areas of the building including outside of the defendants' Apartment 3.

PI Brown explained to me that his covert investigation consisted of several components, of which I am quite familiar, regarding the customs and practices of private investigators. These components were personal, covert surveillance, the placement of

CCTV surveillance video cameras, interviewing his client and any neighbor complainants, maintaining a personal and CCTV surveillance log, photographic surveillance and subcontracting with a social media specialist to recover social media site ads and text messages between defendant Montoya and any persons being solicited by him for sex.

PI Brown told me that, initially, his client, Mr. Kountz, believed that the defendants were associated with illicit narcotics-related activity. Kountz had expressed concerns to him about his personal safety and the safety and security of his partner Boldan and neighbors. He recalled that Kountz had told him that he had been threatened by unknown people who were obvious strangers to the apartment building whom he had found inside the building. He recalled that Kountz had relayed to him that he had once been personally threatened by a black adult male who had approached him inside the apartment building. He believed that Kountz's partner, Boldan, may have also been threatened but could not recall any specific details.

PI Brown told me that Kountz had expressed concerns because he felt threatened by the presence of these stranger both inside and loitering outside in front of his building.

I asked PI Brown if he had interviewed any other persons regarding concerns of safety or threats. He told me that he had interviewed a former tenant, Neil Martinson, and a neighbor, Justin Hutton. PI Brown could not recall what Martinson had told him because he did not have any of his notes with him. He recalled that Hutto had told him that Kountz felt threatened by all the strangers going in and out of the apartment building and visiting Apartment 3. Hutto also said that Kountz felt threatened by all the menacing-looking people he didn't know who were loitering in front of his apartment building.

I asked PI Brown about his professional impressions of the activity associated with 640 Octavia, specifically Apartment 3 and defendant Redacted since he had conducted extensive personal and video surveillance on the property.

PI Brown stated that the CCTV video and written logs document that somewhere between 450 – 467 separate, unknown individuals who were not tenants of the building were observed coming in and out of Heinz-Piper's and Redacted apartment during the period of CCTV surveillance. He advised me that approximately 98% of these individuals were men and most of them only remained inside of Apartment 3 for brief periods of between fifteen, to twenty, to thirty minutes at a time.

PI Brown told me that in his professional opinion, there was no illicit drug sales activity occurring at the 640 Octavia premise and he did not believe that Heinz-Pieper, nor Redacted were involved in the sales and distribution of dangerous drugs.

When asked, he told me that based upon everything he saw and surveilled, more likely than not, Redacted was involved in the business of prostitution.

When investigating possible prostitution activity, law enforcement and forensic investigators look for and consider circumstances, statements, facts and evidence

which are both exculpatory and inculpatory in their determination as to, whether more likely than not, either reasonable suspicion or probable cause exists to believe that prostitution activity is occurring and there is a person(s) associated with that activity. These investigations generally involve the following components:

1. <u>Behavior</u> – Is the behavior of the person of interest more consistent with sex acts for money or any other consideration according to CA state statutes (CA-PC §647(b) – Prostitution). Or consistent with a normal sexual appetite/interest, even in frequency of sexual encounters.

2. <u>How is sex solicited</u> – Is the person of interest occasionally or actively soliciting sex; the frequency of sexual solicitations; the platform(s) of advertising the sexual solicitation(s); and the level and frequency of responses by those solicited.

3. <u>Financial/economic motive</u> – How/if the person of interest is employed; level of personal income; can they reasonably live at that level of income; if their level of income does not reconcile with their lifestyle, then how are they subsidizing their level of lifestyle.

4. <u>Persons responding to sexual solicitations</u> – Analyzing the number and frequency of sexual contacts; times of day/night of contacts; profile(s) of persons responding to the sexual solicitations; time spent at the location where sex is taking place.

5. <u>Complaints of non-sexual ancillary crimes</u> – Presence and types of crimes most often identified with active prostitution locations; as opposed to locations where a normal person with an active sexual appetite would reside.

6. <u>Complaints of prostitution</u> – Are there complaints being received consistent with the profile of a location where prostitution is taking place; as opposed to a drug sales, gambling or other "vice-related" location.

Reconciliation Process

Forensic Accounting – Redacted Income/Expense Estimates

Redacted has submitted his Federal IRS W-2 Form stating total income which indicates that for the 2017 year, he earned a total of $48,410.00 in wages, tips and other compensation. His W-2 form also indicates that the U.S. government withheld $7,533.95, for federal income tax; $3,001.00 for his Social Security account and an additional $702.00 for his Medicare account. This W-2 form also indicates that his California State income tax withholding was $1,989. This means that after federal and state tax and withholdings, Montoya received approximately $35,184.00 for the 2017 year.[4]

Redacted states that he pays Heinz-Pieper $725 each month for rent, utilities and apartment cleaning services. This would equate to approximately $8,700 a year. After

----

[4] Redacted IRS W-2 Form taxes and withholding report, 2017

rent was deducted from Redacted income, he would be left with $26,454 a year to live on.

Redacted states that he commutes from San Francisco to Greenbrae five days a week, or 260 days a year. He must travel over the SF-Bay Bridge to get to work. This means that he must pay a $6 bridge toll each day to commute to work. The cost for Redacted bridge tolls equates to $1,560 a year. Redacted round trip commute to Greenbrae is a minimum of 32 miles each day. This equates to approximately 8,320 miles a year. The average vehicle consumes one gallon of gas per/15 miles. The average price for a gallon of gas in the San Francisco Bay Area is listed at $3.79/gallon.[5] This means that if Redacted drove a car to work, he would use a minimum of 554 gallons a year just for his commute. If so, gas for his weekly commutes to work would cost him $2,050 a year. Deducting these work commute expenses from Redacted income would mean that he would end up with an adjusted income of approximately $22,844 to live on. This figure does not account for any vehicle loan payments or vehicle insurance.

With an average adjusted yearly income of only $22,844 and with the average month being thirty days, this would mean that Redacted daily income ($22,844 ./. 12 mos. = $1,900 ./. 30 days = $63/day) would be only $63/day to pay for all food, clothing, living expenses and incidentals.

Based upon my initial review of Redacted federal and state income tax returns and his statements regarding employment and income, it would be both unusual and unreasonable to believe that Redacted would be able to maintain a normal lifestyle above the poverty level in the City of San Francisco and the San Francisco Bay Area solely on his stated level of income. The City of San Francisco is well-documented to be one of the most expensive urban cities to live in.

Defendant Redacted should provide his bank accounts and credit card statements for confidential review in order to provide exculpatory evidence that he can easily subsist on his present stated income. In absence of that, my finding and opinion that he is a practicing prostitute, stands.

Redacted behavior – Defendant Redacted sexual behavior is far more likely than not consistent with the behavior of an active, prolific prostitute, than a person who enjoys sex and has an active sexual appetite.

In all of my extensive experience covertly investigating, arresting, interviewing and researching prostitutes and prostitution, I cannot recall one single instance of any person with a normal or even an abnormal sexual appetite who would have ten or more sexual encounters a day; at all times of the day/night; for a prolonged period of time. This activity is consistent with an active prostitute.

Redacted sexual encounter subject profile is consistently males whom he has have never met, requiring directions to his residence. Redacted is unable to specifically

---

[5] http://www.ktvu.com/news/san-francisco-bay-area-has-highest-gas-prices-in-us-just-ahead-of-memorial-day-weekend

*Report, Ron Martinelli, Ph.D., CLS*
*640 Octavia v. Heinz-Pieper, USDC Northern Dist. Case #3:18-cv-01047-WHA*

identify most all of the men visiting him for a sexual encounter. The vast majority of these men stay for brief periods of time under thirty minutes. They are not "lovers" as Redacted asserts. The profile of these men is consistent with prostitution clients or "Johns."

Sexual solicitations – Redacted behavior and method of sexual solicitation is consistent with the MO (method of operation) of an active prostitute, rather than a person who loves to have frequent sex. He has assumed a street moniker of "Jessica Wild," and solicits sex on multiple social media platforms known to be used by prostitutes, escorts and pimps, besides normal people looking for sex.

Redacted provides specific instructions to men responding to his sexual solicitations, consistent with an active prostitute. Contrary to his statements that he abated or minimized his sexual activity after receiving a warning from his roommate, Heinz-Pieper, the CCTV surveillance logs document that Redacted merely altered his directions to men visiting him for sex by having them enter/exit the apartment building by using rear stairs. This change in behavior is consistent with what is referred to as a "consciousness of guilt," often used by active prostitutes under police surveillance.

Presence of ancillary crime – Contrary to popular belief, prostitution is not a "victimless crime." There are, in fact and recorded, many victims of prostitution. Vetted research documents that crime is always higher in areas where prostitution is active.

In the immediate case, the crimes and criminal activity most often associated with prostitution activity zones such as threats, intimidation, break-ins and attempted break-ins have been reported by the plaintiff, tenant and neighbor witnesses. Even defendant Heinz-Pieper testifies that he was aware of two break-ins and attempted break-ins of the plaintiff's apartment and a separate forcible entry into the apartment building.

I found it unusual and unreasonable for defendant Heinz-Pieper to not have noticed all of the suspicious and potentially criminal activity that others had consistently observed. It is also noteworthy and remarkable that he concedes that he was aware of multiple break-ins, yet never brought this to the attention of his landlord which would have been important for his own safety and security. As a retired police detective who has investigated hundreds of burglaries and interviewed thousands of victims, I found Heinz-Pieper's statements inconsistent with those of victims who are naturally concerned about their safety and security.

Similarly, I found the testimony of Redacted who stated that he had never observed any of the activity mentioned by his landlord, other tenant(s) and neighbors, to be incredible in consideration of how much suspicious activity there was reported in and about the premise.

While the complaints of plaintiff Kountz and Witnesses Martinson, Boldan, Hutto and PI Brown did not identify the suspicious and criminal activity in and about 640 Octavia as "prostitution," I am aware that these persons are inexperienced laypeople that know little of the dynamics of prostitution. Instead, it was more important for me to read and analyze their observations and statements. It was also important for me to interview PI Brown, who is a longtime recognized, experienced, practicing private investigator and

to question him specifically on what activity(s) he believed were transpiring at the 640 Octavia apartment building and specifically inside the defendants' apartment. Again, PI Brown identified the activity as "prostitution."

Summary of Findings & Opinions

Based upon my review and analysis of the totality of evidence; and in consideration of my extensive law enforcement and forensic experience; as well as my experience on the subjects of vice, prostitution, street crimes and public nuisances, I make the following findings and opinions to a reasonable degree of professional probability:

1. Prostitution activity was taking place inside the defendant's apartment and defendant Redacted was actively engaged in that apartment as a paid prostitute.

2. Whether or not the trier of fact believes that defendant Redacted was engaged in the business of prostitution, his prolific, abnormal sexual activity occurring at all times of the day and night and the sheer numbers of sexual partners he had actively solicited for sex acts, created hostile and threatening living environment for plaintiff Kountz, his partner Boldan, tenants and neighbors in and about the 640 Octavia premises.

3. Defendant Redacted sexual lifestyle, whether for pay or not, created a consistent level of disturbance for the plaintiff, the plaintiff's guests, tenants and neighbors as to constitute a private and public disturbance.

4. Defendants Heinz-Pieper and Redacted had been given proper notice directly by the plaintiff (to Heinz-Pieper) and indirectly (from Heinz-Pieper to Redacted to cease and desist making/creating a disturbance which was ignored by the defendants.

5. I found no direct evidence that plaintiff Kountz and witnesses Boldan, Martinson and Hutto had been physically threatened by unauthorized strangers visiting defendant Redacted for the purpose of engaging in sexual activity. However, I do find that defendant Redacted prolific sexual activity and the types of unknown persons he consistently solicited to visit the 640 Octavia apartment building and the defendants' apartment was sufficiently intimidating to tenants and the plaintiff as to reasonably constitute a sense of threat to their personal safety.

My findings and opinions are based upon my review of the listed documents as provided to me at this time. I will alter, amend, enhance or delete my findings and opinions as necessary following my review of any additional discovery in this case.

I would so testify to my findings and opinions under penalty of perjury if called upon to do so in any subsequent civil proceedings.

*Report, Ron Martinelli, Ph.D., CLS*
*640 Octavia v. Heinz-Pieper, USDC Northern Dist. Case #3:18-cv-01047-WHA*

Signed _____ Date: January 4, 2019

        Ron Martinelli, Ph.D., CMI-V, CLS
        Forensic Criminologist
        Federal/State Courts Qualified Police Practices Expert
        Premises Liability & Security Expert

**EXHIBIT 10**

Pages 1 - 177

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Alsup, Judge

640 Octavia, LLC,           )
                            )
            Plaintiff,      )   **No.  CV 18-1047 WHA**
                            )
vs.                         )   (~~Pages 15 56 placed under~~
                            )   ~~seal by Order of the Court)~~
Karl Heinz-Pieper,          )
                            )
            Defendant.      )
_____ )

San Francisco, California
Monday, July 16, 2018

~~**TRANSCRIPT OF PROCEEDINGS**~~

~~**APPEARANCES**~~:

For Plaintiff:        THE WALSTON LAW GROUP
                      Four Charlton Court
                      San Francisco, CA    94123
              **BY:   GREGORY WALSTON, ESQ.**
                      **CLARA PORTER, ESQ.**


For Defendant:        PERETZ & ASSOCIATES
                      22 Battery Street, Suite 200
                      San Francisco, CA    94111
              **BY:   YOSEF PERETZ, ESQ.**
                      **DAVID GARIBALDI, ESQ.**

                      CRAVENS & ASSOCIATES
                      516 West Shaw Avenue, Suite 200
                      Fresno, CA    93704
              **BY:   DANIEL J. CRAVENS, ESQ.**


Reported By:          Vicki Eastvold, RMR, CRR
                      Official Reporter

BROWN - DIRECT / CRAVENS

 1  locked?  Or is that --

 2          **THE WITNESS:**  That's locked.

 3          **THE COURT:**  So you have to have a key to get through

 4  the gate.

 5          **THE WITNESS:**  That's correct.

 6          **THE COURT:**  Then you go through a little four-foot

 7  sidewalk to the front door.

 8          **THE WITNESS:**  Yes, sir.

 9          **THE COURT:**  Then you need another key to get in that?

10          **THE WITNESS:**  That's correct.

11          **THE COURT:**  Separate key or the same key?

12          **THE WITNESS:**  Separate key, I believe.  I'm not sure.

13          **THE COURT:**  So you observed a homeless person trying

14  the doorknob of the gate.

15          **THE WITNESS:**  Or shaking the gate, as I recall.

16          **THE COURT:**  Okay.  I got it.  Thank you.

17          **THE WITNESS:**  You're welcome.

18  **BY MR. CRAVENS:**

19  **Q.**  All right.  After the outside surveillance was concluded,

20  Mr. Kountze asked you to install a peep hole camera in the

21  building, correct?

22  **A.**  That's correct.

23  **Q.**  And the peep hole camera is a camera that was installed in

24  the door in Unit 4, correct?

25  **A.**  That's correct.

BROWN - DIRECT / CRAVENS

1  Q.   And a peep hole camera -- maybe you can describe for the

2  judge what we're talking about here.  But a peep hole camera is

3  a camera that replaces the peep hole in the door that someone

4  would ordinarily look out, correct?

5  A.   Yes.  It's a Boyo VT K 100.  It's a pin hole that I

6  obtained from Prize Electronics.

7  Q.   Okay.  Now, and this camera looked directly down --

8      THE COURT:  You didn't say what date.  When did that

9  start?

10      THE WITNESS:  We installed it on the 31st of May and

11  --

12      THE COURT:  This year?

13      THE WITNESS:  Last year.

14      THE COURT:  2017.

15      THE WITNESS:  Yes, sir.

16      THE COURT:  All right.

17  BY MR. CRAVENS:

18  Q.   And this peep hole camera looked directly down the hall

19  from Apartment 4 to the door of Apartment 3, correct?

20  A.   Yes.  Common area that allows us to view people coming up

21  the stairwell to Apartment 3 and 4.

22  Q.   And when the door was opened to Apartment 3, the view from

23  the peep hole camera would allow a view of the interior of

24  Apartment 3, correct?

25  A.   Limited amount.

1  **Q.**   All right.  And you recorded the -- you recorded the

2  images that the camera collected, correct?

3  **A.**   Correct.  On a hard drive.

4  **Q.**   And you reviewed those videotapes?

5  **A.**   I did.

6  **Q.**   And you --

7         **THE COURT:**  You called them "videotapes," but he just

8  got through saying "hard drive."  So clarify that.

9         **THE WITNESS:**  Yes, sir.  The hard drive is connected

10 from the camera to the hard drive installed inside the Unit No.

11 4.  And there are -- it's set for motion.  So whenever there's

12 any motion the camera's activated and would record 30 to a

13 minute and-a-half recording.  So any activity coming up the

14 stairwell, which also includes lights going on and off.  In the

15 beginning, there were curtains that would sway from the window

16 and that would activate it.  And I think I have 2,900 -- 2,969

17 video clips for a duration of --

18         **THE COURT:**  But he called it "tapes."

19         **THE WITNESS:**  Not a tape.

20         **THE COURT:**  Not a tape.  It's all hard drive.

21         **THE WITNESS:**  Yes, sir.

22         **THE COURT:**  Did you misspeak, counsel?

23         **MR. CRAVENS:**  What was that?

24         **THE COURT:**  You called them "tapes."

25         **MR. CRAVENS:**  I did.  I betrayed my age.

1      **THE COURT:**  You see, you got me confused.  Because

2   this is important.  This is the United States District Court.

3   You got to ask good questions.

4      **MR. CRAVENS:**  I agree.

5      **THE COURT:**  Just like the other side asked some goofed

6   up questions.  This is important.  Don't overstate, understate,

7   or goof it up.  All right.  Go ahead.

8      **MR. CRAVENS:**  Noted, Your Honor.

9   **BY MR. CRAVENS:**

10  **Q.**  All right.  So we were talking about video files.  And you

11  said there were approximately 2,969 video files?

12  **A.**  That's what I counted, correct.

13  **Q.**  And approximately how many minutes or hours running time?

14  **A.**  Well, those clips, as I call them, we downloaded the

15  clips.  That were probably about -- well, 2,969 clips from

16  June 2017 to February 23 of 2018.  And our reports were based

17  on activities of humans, not necessarily whether curtains --

18  **Q.**  Got it.  Okay.  And when you reviewed those video clips,

19  you saw mostly fit, young men entering and exiting Apartment 3,

20  correct?

21  **A.**  Correct.

22  **Q.**  But you also observed Mr. Pieper naked on that file,

23  correct?

24  **A.**  Yes.  In the common area.

25  **Q.**  You didn't disclose to Mr. Pieper that there was -- well,

**BROWN - DIRECT / CRAVENS**

1    this peep hole camera, there was nothing that discloses the

2    fact that there was a camera in the door, right?

3    **A.**    No, because it was a common area.  It wasn't necessary to

4    notify.

5    **Q.**    Sure.  There wasn't a sign warning anybody that there was

6    a camera?

7    **A.**    There was not.  No, sir.

8    **Q.**    You didn't tell Mr. Pieper that there was a camera that

9    was looking at his unit, correct?

10   **A.**    I did not.

11   **Q.**    So some of the images that were captured showed Mr. Pieper

12   at his door nude, correct?

13   **A.**    Correct.  Stepping out.

14   **Q.**    He was doing what?

15   **A.**    Stepping out of the unit.

16   **Q.**    Stepping out.  All right.  And in your review of these

17   2,969 clips, you found no concrete evidence of any illegal

18   activity occurring in Apartment No. 3, correct?

19   **A.**    I did not determine if there was any illegal activity

20   other than quite a few individuals.  Approximately -- I counted

21   on the reports 450 of them.

22   **Q.**    You didn't observe anything that you would consider

23   concrete evidence of illegal activity, correct?

24   **A.**    Illegal, specifically drugs or sex or prostitution as we

25   discussed in the depo?

**BROWN - DIRECT / CRAVENS**

1  **Q.**    Yes.

2  **A.**    Not specifically, no.

3  **Q.**    All right.  And in your investigation of Mr. Pieper

4  included sending an agent to REDACTED place of work,

5  correct?

6  **A.**    That's right.  I had a licensed investigator, a young

7  lady, that came in to get her hair done.

8  **Q.**    On two occasions, correct?

9  **A.**    That's correct.

10  **Q.**    And her name was Myra Mira (*phonetic*)?

11  **A.**    That's correct.

12  **Q.**    And Ms. -- your instructions to Ms. Mira was to engage in

13  a conversation with REDACTED in order to determine whether

14  he had any activity involving drugs, correct?

15  **A.**    That's correct.

16  **Q.**    And she asked him a series of questions that were designed

17  to induce some comment from REDACTED that would indicate

18  that he had access to drugs or used drugs.  Correct?

19  **A.**    Designed, yes.  And there wasn't indication of REDACTED

20  stating that he does any type of drugs.

21  **Q.**    In fact, she asked him on several occasions about drugs

22  and partying, and REDACTED response to her was, I don't

23  drink.  Correct?

24  **A.**    Correct, yeah.

25  **Q.**    So you conducted more than an 18-month investigation so

1   far, correct?

2   **A.**    Correct.

3   **Q.**    And based on that, the totality of your investigation, you

4   would conclude that there's nothing concrete that supports

5   solicitation or prostitution or drug activity other than the in

6   and out in the front of the property and multiple individuals

7   entering from the stairwell into Mr. Pieper's apartment.  Is

8   that true?

9   **A.**    That's true.

10  **Q.**    And as an experienced investigator, you feel that you

11  would need additional evidence in order to conclude that there

12  was illegal activity in Apartment No. 3, correct?

13  **A.**    Based on my experience, yes.

14  **Q.**    All right.  And the observations -- your observations and

15  the observations of your agent, in your view, are consistent

16  with REDACTED or Mr. Pieper being engaged in frequent

17  consensual sexual activity, correct?

18  **A.**    I'm aware that they had several partners coming up and

19  down the stairs.  I'm not sure of their activities

20  specifically.

21         **MR. CRAVENS:**  Thank you.  I have no further questions,

22  Your Honor.

23         **THE COURT:**  All right.  Thank you.  Any by plaintiff?

24         **MR. WALSTON:**  Very briefly.

25

**KOUNTZE - DIRECT / PERETZ**

 1   each other questions and you got to answer them.  You can't

 2   substitute in your narrative.  You've got to answer his

 3   question fair and square.

 4       Ask the question again.

 5   **BY MR. PERETZ:**

 6   **Q.**  Sir, you have no evidence that you perceived of

 7   REDACTED  selling drugs at the building, correct?

 8   **A.**  I don't.

 9          **THE COURT:**  Thank you.  That's a good square cut

10   answer.

11       All right.  Next question.

12   **BY MR. PERETZ:**

13   **Q.**  Sir, and you have no evidence whatsoever that REDACTED

14   engaged in prostitution in the building?

15   **A.**  I don't.

16   **Q.**  And you have no evidence that he engaged in any act of

17   vandalism at the building, correct?

18   **A.**  When this report was made, I was not in California.  No, I

19   did not.  I heard that the front gate was smashed in, however.

20   **Q.**  And you don't know if it was a homeless person smashing it

21   in, correct?

22   **A.**  I don't know.

23   **Q.**  Okay.  And, in fact, the person who advised you of the

24   lock that got broken was Mr. Pieper, correct?

25   **A.**  No.

KOUNTZE - DIRECT / PERETZ

1    deposition, 183, page -- line 24 -- to 184, line 2.

2            THE COURT:  All right.  Read it exactly as it appears.

3            MR. PERETZ:  Sure.

4    BY MR. PERETZ:

5    Q.  Question:  All right.  Now you mentioned earlier that this

6    retired gentleman was angry about some kind of homeless

7    encampment that was on the block.  Is that right?

8        Answer:  Correct.

9        So, sir, did you know --

10           THE COURT:  Wait.  That's different.  You said -- you

11   said "next to."  And a moment ago you say -- you were getting

12   greedy -- and you wanted him to say it was next to.  But

13   instead, all it says is on the same block.

14       See the problem?  You lawyers do it on both sides.  You

15   try to overreach and get greedy.

16   BY MR. PERETZ:

17   Q.  Is there a homeless encampment at the same block as 640

18   Octavia?

19   A.  There's a homeless encampment across the street and down

20   -- almost half a block away that is usually broken up daily.

21   I've called the police on it.  The homeless encampments on that

22   block are usually broken up within 24 hours.  I've called the

23   police on several of them.

24           THE COURT:  All right.  Next question.

25           MR. PERETZ:  I have no further questions, Your Honor.

# EXHIBIT 11

```
 1              UNITED STATES DISTRICT COURT

 2            NORTHERN DISTRICT OF CALIFORNIA

 3

 4

 5
    640 OCTAVIA, LLC,
 6
                       Plaintiff,
 7
    vs.                               No. C-18-01047
 8

 9  KARL HEINZ PIEPER, et al;

10                     Defendants.
    ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
11

12

13                  DEPOSITION OF

14                   SAMUEL BROWN

15
                    June 13, 2018
16
                     10:20 a.m.
17

18
             22 Battery Street, Ste. 200
19
             San Francisco, California
20

21
        Joan Theresa Cesano, CSR No. 2590
22

23

24

25
```



```
 1                 SAN FRANCISCO, CALIFORNIA;

 2            WEDNESDAY, JUNE 13, 2018; 10:20 A.M.

 3

 4                     SAMUEL BROWN,

 5          having been first duly sworn, testified as

 6   follows:

 7

 8                       EXAMINATION

 9

10        BY MR. CRAVENS:

11     Q    Mr. Brown, my name is Daniel Cravens, and I

12   represent Mr. Pieper in this litigation.

13          Would you state your full name.

14     A    Samuel Brown.

15     Q    All right.

16          And you are a licensed private investigator?

17     A    That's correct.

18     Q    For how long?

19     A    Thirty-five years.

20     Q    And your identification, your license number?

21     A    PI10194.

22     Q    All right.  Thank you.

23          So you were retained by -- you were retained by

24   someone in this litigation, correct, to perform

25   investigation?
```



```
 1        A    That's correct.

 2        Q    Okay.  All right.

 3             So we have outside surveillance, we have inside

 4   surveillance, you had -- you had maybe what you would call

 5   the in-person surveillance at Mr. Redacted  work; right?

 6        A    Correct.

 7        Q    Those are the only three sources that I'm aware

 8   of, of observations about 640 Octavia; is that correct?

 9        A    Let me think.  I'm pretty sure that's it, but let

10   me reflect.

11        Q    Please.

12        A    I believe that was it.

13        Q    Okay.

14        A    And I believe what we have here is 18 months

15   worth of some observations and stuff that it would take me

16   a minute because I want to be honest with you and be able

17   to give you the correct answer based on your question.

18        Q    Sure.  Well, I haven't asked the question yet.

19   So based on the totality of these observations --

20        A    Yeah.

21        Q    -- okay, please tell me everything -- all of the

22   observations that you believe would support the view that

23   there was illegal drug activity or illegal prostitution

24   taking place in Apartment No. 3.

25        A    Well, on numerous occasions or a few occasions,
```



1  men would come out and be adjusting their pants, their

2  zipper, they would wipe their mouth, and they were always

3  tucking in their shirt.

4          And, you know, I can't say specifically if they

5  were using drugs as they were coming in or going out.

6  There is no concrete evidence of that that I could see.

7  But other than the amount of the individuals partaking in

8  whatever's partaking at Apartment 3, which is your

9  dwelling.

10     Q   Okay.  Anything -- any -- let me just summarize.

11         So the observations of -- maybe I did this --

12  maybe I did this wrong.  I've been conditioned, based on

13  the other depositions, to put these two things together,

14  but I think your experience is such that I should have

15  separated them.

16         What observations would you say support the

17  conclusion that there was prostitution occurring in

18  Apartment No. 3?

19     A   The prostitution being is that there were on

20  occasion people -- men were coming in and out adjusting

21  their pants and stuff.  And then on one occasion, Jose --

22  I think Mr. Pieper as well, went down to retrieve other

23  people.  And Mr. Redacted was dressed, I believe, in drag,

24  and that's his preference.  And -- and I believe he had

25  balloons underneath his robe, and that's based on the



1  video of the peephole camera.

2      Q    Okay.

3      A    And there were hundreds of videotapes.

4      Q    So far what I have is evidence of prostitution is

5  men coming out of Apartment No. 3, making some adjustment

6  to their clothes, a variety as you've testified, and

7  wiping their mouths?

8      A    Correct.

9      Q    And Pieper -- Mr. Pieper at some point retrieved

10  people from downstairs.

11      A    He what?

12      Q    You said Mr. Pieper retrieved people from

13  downstairs; is that --

14      A    Yeah, I believe so, he would walk downstairs.

15  And sometimes through the backstairs, too, I couldn't see

16  through the backstairs.  But they would also have to come

17  through the hallway of the common area.

18      Q    Yeah.  And you saw Mr. Redacted dressed in drag?

19      A    Well, he was -- I wasn't -- he has very long

20  hair.  I wasn't sure if it was drag or -- it's just how he

21  rolls.  It's his preference.

22      Q    Okay.  And was there anything else that you

23  observed, considering the totality of your investigation

24  of all of your observations that you believe, based on

25  your 35 years experience, would be potential evidence of



 1  prostitution other than what we've -- the three things
 2  we've identified?
 3      A   That's a very clear question, and based on my
 4  experience, there are things going on in Mr. Pieper's
 5  apartment that I --
 6      Q   You mean nothing by this, I know, but you keep
 7  looking at Mr. Pieper when you refer to him.
 8      A   I'm sorry.
 9      Q   Which is perfectly --
10      A   I respect --
11      Q   -- perfectly normal to do.
12      A   Okay.
13      Q   Not trying to call you out, but I want to avoid
14  any kind of --
15      A   Okay.
16      Q   -- any kind of nodding or back and forth between
17  the two of you.  So just look at me.
18      A   Okay.  I got it.
19      Q   I know you meant no disrespect.
20      A   Yeah.
21      Q   I don't get that vibe from you.
22      A   Okay.
23      Q   All right.
24          So go ahead, and would you repeat back the start
25  of his answer, if you would.  And then if you -- maybe



SAMUEL BROWN                                    June 13, 2018
640 OCTAVIA vs PIEPER

1  you'll start it over again so that there will be a clear
2  answer that doesn't include my interruption.
3      A    Okay.  Got it.
4           (Record read)
5      A    Apartment that I wasn't really --
6      Q    Just start it over.  Start your answer over.
7      A    All right.
8           So I'm in a little pain right now.
9      Q    You need to take a break?
10     A    I probably will in a minute, but I'd like to
11 clear up this.
12          MR. WALSTON:  Do you need to stand up while you
13 answer?  Would that help?
14          THE WITNESS:  A little dizzy.
15          MR. CRAVENS:  Are you able to -- if you need to
16 take a break -- I mean, I don't want you to testify if
17 you're not able to do so accurately.
18          THE WITNESS:  No.  Because I've had multiple back
19 surgeries, a pending epidural.  So I'm a little rough.
20 But I'm here and I believe I can continue.
21          MR. CRAVENS:  Okay.  Go ahead.
22          THE WITNESS:  As long as I'm able to take a
23 break.
24          MR. CRAVENS:  Yeah.
25          THE WITNESS:  Take a walk.



SAMUEL BROWN                                    June 13, 2018
640 OCTAVIA vs PIEPER

```
 1          MR. CRAVENS:  Whenever you need it.
 2          THE WITNESS:  Let me do that now just because I'm
 3  little lightheaded.
 4          MR. WALSTON:  Right.
 5          THE WITNESS:  If that's okay.
 6          MR. CRAVENS:  Okay.  Go for it.  How long do you
 7  need?  You tell me.
 8          THE WITNESS:  About two hours.  No, I'll be back
 9  in about ten minutes.
10          MR. CRAVENS:  You know what?  Delaying torture
11  just extends it.
12          THE WITNESS:  That's okay.  I wanted to be
13  able --
14          MR. WALSTON:  Ten minutes?
15          THE WITNESS:  Yeah.
16          MR. WALSTON:  All right.  Ten minutes.
17          (Recess)
18          BY MR. CRAVENS:
19      Q   Mr. Brown, before the break, I was asking you to
20  list for me the -- all of the observations that you had
21  made that you thought were supportive of or consistent of
22  a finding that there was illegal prostitution in Apartment
23  3.  You had mentioned incidences where people were
24  adjusting their clothes in various ways and wiping their
25  mouth as they -- men were adjusting their clothes in
```



1  various ways and wiping their mouth as they left Apartment

2  3, that Mr. Pieper had retrieved other people from

3  downstairs and that Mr. Redacted was observed dressed in

4  drag.

5      A   Or something.

6      Q   Something like that.

7          Is there anything else, any other observations to

8  add to that you believe and supports a finding that there

9  was illegal prostitution in Apartment No. 3?

10     A   Not at this time.

11     Q   Okay.  Does -- does the -- actually, okay.  I'll

12 ask it a different -- I want to ask you the same question

13 for illegal drug selling.

14         Was there some -- please tell me all of the

15 observations that you have that would support a finding

16 that there was illegal drug selling out of Apartment No.

17 3, based on the totality -- again, based on the totality

18 of your investigation.

19     A   Outside and inside; correct?

20     Q   Yeah, everything.  All of your observations.

21     A   I think by standing out front, being text in, and

22 then fifteen minutes leaving, like making a purchase or

23 doing something, but it's not conclusive specifically on

24 drugs or prostitution.

25     Q   It's unusual but not conclusive as to illegal



SAMUEL BROWN                                                          June 13, 2018
640 OCTAVIA vs PIEPER

1

2

3                        REPORTER'S CERTIFICATION

4

5            I, Joan Theresa Cesano, Certified Shorthand

6    Reporter, in and for the State of California, do hereby

7    certify:

8                  That the foregoing witness was by me duly

9    sworn; that the deposition was then taken before me at the

10   time and place herein set forth; that the testimony and

11   proceedings were reported stenographically by me and later

12   transcribed into typewriting under my direction; that the

13   foregoing is a true record of the testimony and

14   proceedings taken at that time.

15

16           IN WITNESS WHEREON, I have subscribed my name,

17        this 25th day of June, 2018.

18
                         *Joan Theresa Cesano*
19

20                   Joan Theresa Cesano, CSR No. 2590

21

22

23

24

25



**EXHIBIT 12**



young sexy passable discreet girl looking to give head and more - t4m

I'm at the gate                                                          Sun 8/20/2017, 11:10 PM

HS    hot.safe.fun sexy.looking
      Let me know when at the gate :D                                    Sun 8/20/2017, 11:09 PM

HS    hot.safe.fun sexy.looking                                          ...
      Sun 8/20/2017, 11:09 PM

      Ok daddy come to gate plz ill bizz you up and come all the way up to apt 3, take shoes off and leave them outside, my
      room is at the end to the left im watching porn. Plz ve quiet my neighbors are sleeping

      :D

      ...

HS    hot.safe.fun sexy.looking
      take your time                                                     Sun 8/20/2017, 10:12 PM

      REDACTED

      me too is the traffic                                              Sun 8/20/2017, 10:10 PM

HS    hot.safe.fun sexy.looking
      message me daddy i am still getting ready                          Sun 8/20/2017, 10:09 PM

Montoya 000061



Montoya 000065



Montoya 000070



young sexy passable discreet fun girl looking to give head & more - t4m

craigslist reply da4t

Come to the gate let me know when u get here bc the doorbell doesnt work ill buzz you up come all the way up to apt is 3 plz be very quiet when coming up, Take shoes off at the door and leave them outside, my room is at the end to left :D

...

craigslist reply da4f
Lol Sent from my iPhone                                                                    Sat 9/16/2017, 11:56 PM

jessica wild
walk across the st so i can see you plz :D                                                 Sat 9/16/2017, 11:55 PM

craigslist reply da4f
I'm here Sent from my iPhone                                                               Sat 9/16/2017, 11:54 PM

jessica wild
Just let me know when u get here :D                                                        Sat 9/16/2017, 11:48 PM

craigslist reply da4f
Do I need a code to get into your place Sent from my iPhone                                Sat 9/16/2017, 11:48 PM

Montoya 000097



**young sexy passable discreet fun girl looking to give head & more - t4m**

jessica wild
Yes :D
Sun 9/17/2017, 12:09 AM

craigslist reply da4f
I can do that, you can always hit me up to Sent from my iPhone
Sun 9/17/2017, 12:08 AM

jessica wild
So hot daddy thanks, hit me up again :D
Sun 9/17/2017, 12:01 AM

craigslist reply da4f
I'm here Sent from my iPhone
Sat 9/16/2017, 11:56 PM

jessica wild
Sat 9/16/2017, 11:56 PM
craigslist reply da4f ⌄

Come to the gate let me know when u get here bc the doorbell doesnt work ill buzz you up come all the way up to apt is 3 plz be very quiet when coming up, Take shoes off at the door and leave them outside, my room is at the end to left :D

Montoya 000098











Montoya 000123

**EXHIBIT 13**

Yosef Peretz (SBN 209288)
yperetz@peretzlaw.com
David Garibaldi (SBN 313641)
dgaribaldi@peretzlaw.com
PERETZ & ASSOCIATES
22 Battery Street, Suite 200
San Francisco, CA 94111
Tel: 415.732.3777
Fax: 415.732.3791

Attorneys for Defendant KARL-HEINZ PIEPER

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| 640 OCTAVIA, LLC<br><br>Plaintiff,<br><br>v.<br><br>KARL-HEINZ PIEPER and DOES 1-45, inclusive,<br><br>Defendants. | Case No.  3:18-cv-01047-MEJ<br><br>**DECLARATION OF FRANK JAY FAUSTINI IN OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**<br><br>**Date:**     **May 10, 2018**<br>**Time:**     **8:00 a.m.**<br>**Courtroom: 12**<br>**Judge:**     **William Alsup** |

I, Frank Jay Faustini, Jr., declare as follows:

1.     I make this declaration in opposition to Plaintiff's Motion for a Preliminary Injunction.  If called as witness in this matter I would and could competently testify to the following.

2.     I am a licensed real estate appraiser (AL042426) and have been principal of Faustini Appraisal Services, a sole proprietorship, from 2007 to the present.  I specialize in developing residential appraisals and providing appraisals services in the San Francisco Bay Area for litigation, asset evaluation, dissolution, estate, and mortgage purposes.

3.     I graduated from Cornell University in 1990 with a Bachelor's of Arts in Economics, and obtained a J.D. from the Northwest School of Law of Lewis & Clark College in 1996.  A true and correct copy of my curriculum vitae is attached hereto as Exhibit 1.

4.     I was retained to estimate, as of April 12, 2018, whether Defendant KARL-HEINZ PIEPER ("Defendant")'s monthly rent of $976.92 for his one bedroom apartment located at 640

Octavia Street, Apt. 3, San Francisco, California 94102 (the "Premises") is significantly below market rate, and if so, approximately how much. I was also retained to determine whether the relative market value of the building located at 640 Octavia Street (the "Building") would be affected by the property having no such tenancy.

5.      The Building is a four-unit, two-story property built in 1923 with three one-bedroom apartments and one two-bedroom apartment, a parking garage located on the ground floor with room for four cars, and contains an additional unpermitted unit. The Building is located in the Hayes Valley district of San Francisco, a neighborhood of good quality and appeal and in close proximity to schools, shopping, hospitals, parks and employment.

6.      The Premises is a one bedroom apartment located within the Building and is being rented to Defendant, a 59 year-old male, for $972.92 per month. The monthly rent is at or around the maximum allowable level under the San Francisco Rent Ordinance.

7.      Listings for comparable one bedroom properties within the Hayes Valley district range from $2,590 to $5,400, with predominate value above $4,000, and no current listings that I could find had an asking rent below $2,500 per month. Thus, it can be concluded that Defendant's current rent of $976.92 is well below market value, less than 50% than the current market rate.

8.      The Building appears to have been purchased on December 22, 2016 in an arms-length transaction for $2,400,000.

9.      In the Hayes Valley district and comparable areas, buildings with vacant units, or owner-occupied units delivered vacant, have much greater market appeal than buildings containing units with controlled rents significantly below current market rates. Rent-controlled apartments within buildings in Hayes Valley have a discernible effect upon the sales price of the building, between 2% to over 10% of the sales price per unit.

10.     Thus, there is a significant difference between (i) the market value of the Building under the hypothetical condition that the Building would be sold with Defendant's unit vacant; and (ii) the market value of the Building with Defendant's unit being delivered with his current tenancy intact.

11.     A true and correct copy of my report detailing the above findings is attached hereto as Exhibit 2.

1        I declare under penalty of perjury under the laws of the State of California that the

2    foregoing is true and correct of my own personal knowledge and as to such matters, I am informed

3    and believe that they are true and correct.

4

5        Executed on April 13, 2018 at **Alameda** , California

6

7

8                                      Frank Jay Faustini, Jr.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT 1**

# QUALIFICATIONS (CURRICULUM VITAE)

**Frank Jay Faustini Jr., J.D.**
**Residential Real Estate Appraiser**
2623 Eagle Ave.
Alameda, CA 94501
Phone: (415) 305 7974
jayfaustini@comcast.net

**EDUCATION:**

**Cornell University**, College of Arts and Sciences, Ithaca, New York

**B.A.**, Economics (1990)

**Northwest School of Law of Lewis & Clark College**, Portland, Oregon

**J.D.**, Certificate of Specialization in Environmental Law, (1996)

**PROFESSIONAL EXPERIENCE:**

*Real Estate Appraisal:*

**Sole Proprietor,**    San Francisco/Alameda, CA    Real Estate Appraiser
2007-Present
Developed residential appraisals and provided appraisal services in the San Francisco Bay Area for litigation, asset evaluation, dissolution, estate and mortgage purposes. Provided estate consulting, litigation support and expert testimony services to clients.

*Appraisal Firm Affiliations:*

**Grey Appraisal Associates,**  Pacifica, CA    Real Estate Appraiser
2014-2016
Chief San Francisco appraiser for firm specializing in appraisal services for asset evaluation, dissolution, estate and litigation purposes. Provided litigation support for head of firm.

*Appraisal Firm Affiliations (cont.):*

**Think APAP,** Palo Alto, CA                         Real Estate Appraiser
2012-2013
Developed residential appraisals in the San Francisco Bay area.

**Audino & Associates,** San Francisco, CA          Real Estate Appraiser
2009-2011
Developed residential appraisals in the San Francisco Bay area.

**C&D Real Estate Appraisal, Inc.,** San Carlos, CA      Real Estate Appraiser
2008-2009
Developed residential appraisals in the San Francisco Bay area.  Provided
presentations to clients on appraisal process and regulations.

**Present Value LLC ,** San Diego, CA                Real Estate Appraiser
2007-2011
Developed residential appraisals in the San Francisco Bay area.

**Alpine Appraisal Group,** Truckee, CA          Real Estate Appraiser Trainee
2002-2007
Developed residential appraisals in the North Lake Tahoe/Truckee area.
Experience includes 2-4 unit dwellings, reviews and Lake Tahoe lakefront
properties.  Completed all aspects of assignments on complex properties.


**EXPERT WITNESS:**

Qualified as an expert witness in California Superior Court, San Francisco
County

*Recent Expert Testimony:*

In re Marriage of Austin/Miller- Austin
Case number:  FDI-14-780775
San Francisco Superior Court
March 2017

In re Marriage of Lum/Chi
Case number:  FDI-09769130
San Francisco Superior Court
January 2017

**REFERENCES:**

Brian Grey, SRA          Certified Residential Appraiser
Pacifica, CA             (650) 355-7400

Andrea Kramer            Vice President / Senior Review Appraiser
Los Angeles, CA`         City National Bank
                         (714)328-2861

James E. Owen            Review Appraiser
El Toro, CA              JP Morgan Chase - Private Client Division
                         (949) 212-8522

Andrea Tameron           Certified Residential Appraiser
San Francisco, CA        (415) 235-2352

Andrei Fintescu          Certified Residential Appraiser
Sacramento, CA           (415) 305-6551

# EXHIBIT 2



# Faustini Appraisal Services

April 13, 2018

David Garibaldi, Esq.
Peretz & Associates
22 Battery Street, Suite 200
San Francisco, CA 94111
Phone: (415) 732-3777 x 108, (415) 534-6240
E-mail: dgaribaldi@peretzlaw.com

Re:  640 Octavia St., San Francisco, CA  94102

Dear Mr. Garibaldi,

At your request, I have undertaken and completed an analysis of relative market value for the above referenced property.  The above referenced property is also identified as a portion of San Francisco County Assessor's Parcel No. 0793-022.  You are my Client in this matter and the intended user of this report.  The intended use of the appraisal is to assist you in the performance of your duties as counsel.

The purpose of analysis is to estimate, as of April 12, 2018, the relative market value of: (i) the referenced property with the presence of the current long term tenancy (with a controlled rent significantly below market rent); as compared to (ii) the hypothetical condition of the property having no such tenancy.

Market value is defined by The Dictionary of Real Estate Appraisal as: **"The most probable price as of a specified date, in cash, or in terms equivalent to cash, or in other precisely revealed terms, for which the specified property rights should sell after reasonable exposure in a competitive market under all conditions requisite to a fair sale, with the buyer and seller each acting prudently, knowledgeably and, for self-interest, and assuming that neither is under duress."**  The function of this analysis is to serve in the settlement of landlord tenant issues.  The analysis was conducted to follow your request and was performed in accordance with the Uniform Standards Of Professional Appraisal Practice.

As a result of my investigation and analyses of data gathered during this assignment, it is my opinion that, as of April 12, 2018, (i)  the market value of the property under the hypothetical condition that Unit #3 is vacant; is significantly higher than (ii) the "as is" market value of the subject property encumbered with the current tenancy of Unit #3.

Respectfully Submitted,

*Frank J Faustini Jr.*

Frank J. Faustini Jr.
AL042426

**Faustini Appraisal Services**
**PO Box 2692**
**Alameda CA  94501**
**(415) 305-7974**
jayfaustini@comcast.net

 # Faustini Appraisal Services

**SCOPE OF WORK:**

The Client has requested a current analysis of the market value of the subject property, 640 Octavia St.

The Client has requested the appraiser to provide opinion of the relative value of the subject property under the following conditions:

(i)  the "as is" market value of the property with the current tenancy of Unit #3, with its controlled rent; as compared to
(ii) the market value of the property under the hypothetical condition that Unit #3 is vacant.

The difference between these values requires the making of determinations concerning rental value, or, market rent.  The definition of rental value, or, market rent, used in this analysis is from The Dictionary of Real Estate Appraisal:  **"The rental income that a property would most probably command in the open market; indicated by current rents paid and asked for comparable space as of the date of appraisal."**

The Scope of Work is the type and extent of research and analyses performed in an appraisal assignment that is required to produce credible assignment results, given the nature of the appraisal problem, the specific requirements of the intended user(s) and the intended use of the appraisal report.

The Scope of Work for this appraisal assignment is defined by the complexity of this appraisal assignment and the reporting requirements of the Client, including the above definitions of market value/market rent, and certifications below.  The appraiser has: (1) inspected the neighborhood, (2) researched, verified, and analyzed data from reliable public and/or private sources, and (3) reported the analysis, opinions and conclusions in this appraisal report.

Note:  The Client has not requested an opinion of current market value of the subject property. The opinions offered in this report concern only relative values between actual and hypothetical conditions of the subject.  This report should not be considered, in any way, to be an opinion of actual market value of the subject.

 # Faustini Appraisal Services

**NEIGHBORHOOD CHARACTERISTICS:**

The subject is located in the Hayes Valley district within the City of San Francisco.  The subject's immediate area consists of an urban mix of single family, 2-4 units and multi-family residences of good quality and appeal as well as commercial properties.  Neighborhood commercial uses are predominately retail and are concentrated along Hayes St. and Haight St. Subject is in close proximity to schools, shopping, hospitals, parks and employment. The San Francisco Central Business District is approximately 2 miles to the Northeast.

**SUBJECT PROPERTY CHARACTERISTICS:**

No inspection of the subject property was performed.  The appraiser has relied upon information from the Client, county records, other publically available information and the relatively recent MLS listing of the subject property in connection with its last sale on December 22, 2016.  This prior sale was for $2,400,000 (Realist Doc#K378678).  It appears to have been an arms length transaction (San Francisco Association of Realtors MLS#451561).

The subject is located in the Hayes-Gough Neighborhood Commercial Transit zoning district. Its current four unit use is an allowable use.  As of the effective date, the highest and best use of the subject property, as improved, is concluded to be as a four unit residential income property.

The subject is a four unit property with 3 one bedroom units and a two bedroom unit.

The subject structure is a Edwardian-Row style four unit income residence constructed in 1923, containing of 3 one bedroom units and a two bedroom unit.  It consists of two stories above a ground level garage.  The garage has parking for four cars.   The recent MLS listing for the subject also notes additional unpermitted rooms/unit.   Analysis of the relative relationship between the values described above do not require a detailed analysis of the condition of the subject property, as the relative difference being analyzed assumes no difference in the condition of the property.

Per information provided by the Client and verified with the recent MLS listing of the subject, subject property's Unit #3 is currently rented to a long term tenant with a controlled rent significantly below current market levels.  Per the Client, the tenancy is currently approximately 25 years old and has a controlled rent of $992.  The 2016 MLS listing notes a slightly lower rent for this unit of $981, which demonstrates a recent rental increase and indicates that the current rent is at the maximum allowable level.

The appraiser assumes that the subject has no physical deficiencies or adverse conditions and that all major systems are functional.



# Faustini Appraisal Services

**PROCESS**:

The terms of this assignment were defined earlier in this report.

In order to form a basis for estimating the difference between two above defined values of the subject property, analysis of both the current market rent of Unit #3 and the market value of the entire property is necessary.

Unit #3 Rent:

Unit #3 is a one bedroom unit.  Research was conducted concerning rentals of one bedroom units in the subject's immediate market area of the Hayes Valley district.  Listed below is a summary of the results of this research.

The rental listing site with the highest volume of local listings, Craigslist.org, currently has 65 listings of one bedroom properties marketed within the Hayes Valley district.  (However this figure does include numerous re-postings of the same units.)  The listings range in asking price from $2,590 to $5,400, with predominate value above $4,000.  A review of other rental listing sites containing approximately 20 (Hotpads) and 30 (Zillow) one bedroom listings in the district also found no current listings with a asking rent below $2,500.

Given the current range of the one bedroom rental market within the Hayes Valley district, it can be concluded that Unit #3's current rent of $992 is less than 50% of the units' current market rent.

Relative Market Value:

In order to determine the effect upon the subject's market value of Unit #3's controlled rent.  The appraiser relied upon and reviewed his appraisal files which contain extensive prior analysis of similar 2-4 unit properties with the subject's extended market area (including the subject Hayes Valley district and the nearby and competing districts).  A review this market data indicates that in every sale analyzed which contained a unit with a controlled rent significantly below market value (below 50%), a discernable effect upon the sales price can be identified.  The range of this effect defined by this data, as a percentage of sales price is 2% to over 10% per unit.  No sales were found that indicated the presence of a significantly below market rent tenancy had little to no effect upon sales price

The analysis indicates that within the subject's market area, 2-4 unit buildings with vacant units (or owner occupied units delivered vacant) have greater market appeal than buildings containing units with controlled rents significantly below current market rates.

 **Faustini Appraisal Services**

**<u>CONCLUSION:</u>**

After application of appropriate analysis and considering the elements which affect market values, it is my opinion that, as of April 12, 2018:  there is a significant difference between (i) the market value of the subject property under the hypothetical condition that Unit #3 was vacant; and (ii) the market value of the property with Unit #3 being delivered to the buyer with the current tenancy intact;  with (i) being higher than (ii) by a significant percentage of at least 2%.

Notes:
The subject's estimated exposure time, as of the effective date, was under 3 months.
Signatures contained herein are digitally computer generated. This is an appraisal report.

Very Truly Yours,

Frank J. Faustini Jr.
AL042426



# Faustini Appraisal Services

**CERTIFICATION: The Appraiser(s) certifies and agrees that:**

1.  The Appraiser has no present or contemplated future interest in the property appraised, and neither current or future employment, nor compensation for performing this appraisal, is contingent upon the appraised rental value of the property.

2.  The Appraiser has performed no services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.

3.  The Appraiser has no personal interest in or bias with respect to the subject matter of the appraisal report or the participants to the assignment.  The opinions contained in this report are not based in whole or in part upon the race, color or national origin of the prospective owners or occupants of the property under assignment or occupants of the properties in the vicinity of the property appraised.

4.  The Appraiser has not personally inspected the subject property.  To the best of the Appraiser's knowledge and belief, all statements and information in this report are true and correct, and no significant information has been knowingly withheld.

5.  All contingent and limiting conditions are contained herein (imposed by the terms of the assignment or by the undersigned affecting the analyses, opinions and conclusions contained in the report).

6.  This report has been made in conformity with and is subject to the requirements of the Uniform Standards of Professional Appraisal Practice.

7.  All analysis, conclusions and opinions concerning the real estate that are set forth in the appraisal report were prepared by the Appraiser whose signature appears on the appraisal report and were prepared in an impartial and unbiased manner. No change of any item in the appraisal report shall be made by anyone other than the Appraiser, and the Appraiser shall have no responsibility for any such unauthorized change.

8.  The engagement and compensation for this assignment was not contingent upon the reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value estimate, the attainment of a stipulated result, or the occurrence of a subsequent event.

9.  Any data mentioned and/or collected during my investigation that has not been included in this report will be retained in the office file; said file is incorporated herein by reference and is an integral part hereof.

10.  No one provided significant assistance in the preparation of this appraisal.

Signed,

*Frank J Faustini Jr.*

Frank J. Faustini Jr.
AL042426